UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROY SICULAR,                                         :

                Plaintiff,            :            09 Civ. 0981 (AKH) (AJP)

          -against-                        :            **REPORT AND RECOMMENDATION**

N.Y.C. DEPARTMENT OF HOMELESS          :
SERVICES, CARROL DAVID, MARIA
RODRIGUEZ & RAYMOND RAMOS,              :

             Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Alvin K. Hellerstein, United States District Judge:**

        Pro se plaintiff Roy Sicular, a sixty year old Caucasian Jewish male, brings this action pursuant to Title VII, the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), alleging that defendants discriminated against him on the basis of his race, age, and religion, and that defendants retaliated against him.  (Dkt. No. 1: Compl. at 1-3; see also Dkt. No. 27: Defs. Rule 56.1 Stmt. ¶ 1; Dkt. No. 28: Defs. Br. at 1.)

        Presently before the Court is defendants' summary judgment motion.  (Dkt. No. 27: Notice of Motion; see also Defs. Br.; Dkt. No. 27: Defs. Rule 56.1 & 56.2 Stmts.)  For the reasons set forth below, defendants' summary judgment motion should be GRANTED.

## FACTS

On February 20, 2006, plaintiff Roy Sicular began employment as a probationary Fraud Investigator with the New York City Department of Homeless Services ("DHS"). (Dkt. No. 27: Defs. Rule 56.1 Stmt. ¶ 3; Dkt. No. 27: Ex. B:[1/] Sicular Dep. at 41.) His probationary period was twelve months. (Defs. Rule 56.1 Stmt. ¶ 4; Ex. C: Sicular's Competitive Probation Stmt. Form.) During his six months as a DHS probationary Fraud Investigator, Sicular worked out of the Preventive Assistance and Temporary Housing Unit ("PATH"). (Defs. Rule 56.1 Stmt. ¶ 6; Sicular Dep. at 44; Ex. D: David Dep. at 11.)

## Events Leading up to Sicular's Termination

On March 28, 2006, during a training session for Fraud Investigators at PATH, Sicular made a statement concerning foreign drivers. (Defs. Rule 56.1 Stmt. ¶ 7; Ex. E: 3/28/06 Barclay Email.) In a room full of his co-workers and supervisor Donaldson Barclay, Sicular said that some of the DHS foreign drivers may not be experienced drivers because "there are no stop signs in their countries." (Defs. Rule 56.1 Stmt. ¶ 7; Ex. F: Sicular Aff. ¶ 2; Ex. B: Sicular Dep. at 54, 79.) Barclay and several of Sicular's co-workers were offended by Sicular's inappropriate statement. (Defs. Rule 56.1 Stmt. ¶ 8; Ex. E: 3/28/06 Barclay Email; Ex. G: Barclay Aff. ¶¶ 2-4; Ex. H: Boatswain Aff. ¶¶ 4-5; Ex. I: Samdani Aff. ¶¶ 4-5.) One of Sicular's co-workers felt uncomfortable around Sicular after this statement. (Defs. Rule 56.1 Stmt. ¶ 8; Samdani Aff. ¶ 4.) After the training

---

[1/]    Unless otherwise indicated, references to Exhibits are to the exhibits to the affidavit of Assistant Corporation Counsel Rebecca Hirschklau (Dkt. No. 27).

session, supervisor Barclay informed Sicular that his statement was inappropriate.  (Defs. Rule 56.1 Stmt. ¶ 9; Ex. G: Barclay Aff. ¶ 4.)   The matter was referred to Patricia Gordon, DHS Deputy Director of the Office of Equal Opportunity Affairs.  (Defs. Rule 56.1 Stmt. ¶ 9; Ex. E: 3/30/06 Email; Ex. J: 4/4/06 Email.)  Sicular admits that he made the comment, and that it was a "stupid comment."  (Ex. B: Sicular Dep. at 79-81; Ex. F: Sicular Aff. ¶ 4.)

On March 29, 2006, Sicular conducted a field visit and afterward behaved in a way which defendant Maria Rodriguez, PATH Manager for Intake, found inappropriate.  (Defs. Rule 56.1 Stmt. ¶ 10; Ex. K:  Rodgriguez Dep. at 20-21; Ex. L: 3/29/06 Agbonwaneten Email; Ex. M: 3/30/06 Rodriguez Email.)  According to defendant Rodriguez, Sicular was upset because he was sent to complete a field investigation which he believed had been completed the previous week.  (Defs. Rule 56.1 Stmt. ¶ 10; Rodriguez Dep. at 20; 3/29/06 Agbonwaneten Email.)  Defendant Rodriguez testified that Sicular came into her office, started yelling and refused to listen to her.  (Defs. Rule 56.1 Stmt. ¶ 10; Rodriguez Dep. at 20-21.)

Also on March 29, 2006, Sicular hand-wrote a  letter to Iris Rodriguez complaining that he was given a wrong address, that he could not serve an applicant that had been transferred to another location, and that he was sent to do an investigation that was completed during the previous week.  (Defs. Rule 56.1 Stmt. ¶ 13; Ex. N: 3/29/06 Sicular Letter.[2])  In the letter, Sicular declared that he "can't understand how [her] office does business" and that he is "offended by the apathy indifference and incompetence!!!"  (Defs. Rule 56.1 Stmt. ¶ 13; 3/29/06 Sicular Letter.)

---

[2]        This letter is mistakenly dated March 29, 2007.

4

Also on March 29, 2006, DHS Field Coordination employee Neville Agbontwaneten emailed defendant Rodriguez to inform her that Sicular behaved inappropriately in front of a primary tenant and portrayed DHS in a "bad light" to the general public.  (Defs. Rule 56.1 Stmt. ¶ 11; Ex. L: 3/29/06 Agbonwaneten Email.)

On March 30, 2006, defendant Rodriguez wrote an email to defendant Carol David that cited Sicular's behavior the previous day and "strongly recommend[ed] that he be terminated." (Defs. Rule 56.1 Stmt. ¶ 12; Ex. M: 3/30/06 Rodriguez Email.)

On April 26, 2006, Sicular complained of being sent to a home that a Fraud Investigator team already had visited and that the car he was assigned to had no gas.  (Defs. Rule 56.1 Stmt. ¶ 14; Ex. O: 5/1/06 Rodriguez Memo.)  Defendant Rodriguez testified that Sicular became very upset when she told him that she knew the car had no gas and would address it with the team that had the car earlier.  (Defs. Rule 56.1 Stmt. ¶ 14; Ex. K: Rodriguez Dep. at 14; Ex. O: 5/1/06 Rodriguez Memo.)

That same day, April 26, 2006, Mr. Rampersaud, a PATH Intake Team Leader and supervisor, was assigned to review each Fraud Investigator team's investigation packages to make sure that all information was complete and all questions were answered.  (Defs. Rule 56.1 Stmt. ¶ 15; Ex. K: Rodriguez Dep. at 14; Ex. O: 5/1/06 Rodriguez Memo.)  Rampersaud discovered that Sicular's field investigation paperwork contained Sicular's written comments that were not part of the field investigation.  (Defs. Rule 56.1 Stmt. ¶ 15; Rodriguez Dep. at 20-21; 5/1/06 Rodriguez Memo.)  Sicular had written personal comments on the field investigation paperwork regarding the

location being visited twice, and the lack of professionalism at DHS.  (Defs. Rule 56.1 Stmt. ¶ 15; Rodriguez Dep. at 20-21; 5/1/06 Rodriguez Memo.)   Rampersaud brought Sicular's written comments to defendant Rodriguez's attention.  (Defs. Rule 56.1 Stmt. ¶ 15; Rodriguez Dep. at 14-15.)  Sicular was instructed not to write such comments on field investigation questionnaires, and that if he needed to write additional comments concerning a field visit he should write them on "case notes" sheets, with which he was provided.  (Defs. Rule 56.1 Stmt. ¶ 15; Rodriguez Dep. at 15; 5/1/06 Rodriguez Memo.)  Defendant Rodriguez testified that the field investigation documents are legal documents that can be used in court and thus cannot contain unrelated comments.  (Defs. Rule 56.1 Stmt. ¶ 15; Rodriguez Dep. at 15.)  Defendant Rodriguez also testified that, after Sicular was instructed that he could not write unrelated comments on the field investigation questionnaires, Sicular started yelling and appeared very upset.  (Defs. Rule 56.1 Stmt. ¶ 16; Rodriguez Dep. at 15; 5/1/06 Rodriguez Memo.)  When Sicular did not leave defendant Rodriguez's office, she told him that if he did not leave she was going to call security.  (Defs. Rule 56.1 Stmt. ¶ 16; Rodriguez Dep. at 15; 5/1/06 Rodriguez Memo.)  Defendant Rodriguez testified that Sicular said, "You feel powerful because you have security here."  (Defs. Rule 56.1 Stmt. ¶ 16; Rodriguez Dep. at 15.)

On April 30, 2006, Sicular was counseled by his supervisor, defendant Ramos, regarding his numerous instances of lateness and distribution of personal materials on DHS time.  (Defs. Rule 56.1 Stmt. ¶ 17; Ex. P: 5/1/06 Ramos Memo.)  Sicular was late on April 25, 26 and 27, 2006.  (Defs. Rule 56.1 Stmt. ¶ 18; 5/1/06 Ramos Memo.)  Sicular admits that he was late on those occasions.  (Ex. B: Sicular Dep. at 103.)  Defendant Ramos verbally warned him that any further

instances of lateness would be documented and appropriate action would be taken if necessary. (Defs. Rule 56.1 Stmt. ¶ 18; 5/1/06 Ramos Memo.)  Sicular had distributed to his co-workers an article from The Chief-Leader along with a column of his typed comments.  (Defs. Rule 56.1 Stmt. ¶¶ 20-21; 5/1/06 Ramos Memo; Sicular Dep. at 61-62; <u>see also</u> Ex. Q: Article with Sicular's Comments.)  Sicular's comments asserted that the article "is an example of the arrogance of some of the managers and supervisors at DHS."  (Defs. Rule 56.1 Stmt. ¶ 21; Sicular Dep. at 62-63, 103; Article/Comments.)  Sicular's comments also included:

> I have resolved conflicts as a shop steward and chapter leader at other agencies on the local level.  I was shocked and dismayed at the attitude of the supervisor that told me "this is DHS."  Well, guess what; DHS is part of the City of New York which is part of the United States of America which has laws that protect citizens and employees against arbitrary and capricious and illegal actions.  DHS is not a law unto itself, no matter how many police they have on their premises.

> We don't live in a police state.  The culture of this organization should be updated.  The autocratic management style is not suited to a group of professional employees; most of whom hold university degrees.  We are not working in a fast food restaurant.  This is not the time of the company town where all sorts of fees were ta[ken] from the employee.

(Defs. Rule 56.1 Stmt. ¶¶ 22-23; Article/Comments.)  Sicular's comments  also stated that placing disciplinary material in an employee's file was "low level harassment from management."  (Defs. Rule 56.1 Stmt. ¶ 23; Article/Comments.)   Defendant Ramos counseled Sicular regarding this personal message because defendant Ramos felt this article denigrated the entire agency, and that Sicular's comments did not breed camaraderie and cohesiveness.  (Defs. Rule 56.1 Stmt. ¶ 24; Ex. R: Ramos Dep. at 25-26.)

On May 1, 2006, defendant Rodriguez felt threatened by Sicular and left the room after Sicular clapped his hands in front of her face, mentioned something with the word "dog," and despite being asked to stop, would not stop clapping and again began yelling. (Defs. Rule 56.1 Stmt. ¶ 25; Ex. K: Rodriguez Dep. at 10; Ex. O: 5/1/06 Rodriguez Memo.)

Also on May 1, as a result of the incidents on April 26, 2006 and May 1, 2006, defendant Rodriguez and defendant Ramos met with Sicular regarding his inappropriate and insubordinate behavior. (Defs. Rule 56.1 Stmt. ¶ 26; Ex. O: 5/1/06 Rodriguez Memo at 2.)

On May 29, 2006, Memorial Day, Sicular approached defendant Ramos's desk and made the comment that "'On this Memorial Day, I feel the US citizens should have first crack at employment. I have nothing against immigrants, just that, Americans should get the jobs.'" (Defs. Rule 56.1 Stmt. ¶ 28; Ex. S: 5/29/06 Ramos Email.) Sicular admits that he made this comment to Ramos. (Ex. B: Sicular Dep. at 65.) Later that day, defendant Ramos sent an email to PATH Group 8 Leader Moses Ajasin, describing Sicular's comment and stating that "I believe Mr. Sicular would be better off somewhere else." (Defs. Rule 56.1 Stmt. ¶ 27; 5/29/06 Ramos Email.) Defendant Ramos felt the tone of Sicular's conversation was distasteful and wanted to make sure his supervisor was aware of it. (Defs. Rule 56.1 Stmt. ¶ 29; Ex. R: Ramos Dep. at 51-53.) Defendant Ramos also informed Ajasin that Sicular had complained that he had trouble understanding his Fraud Investigator partner, and that Sicular previously also had expressed similar sentiments regarding foreign employees. (Defs. Rule 56.1 Stmt. ¶ 30; Ramos Dep. at 52-53; 5/29/06 Ramos Email.) As a supervisor, defendant Ramos felt that Sicular's attitude was not conducive to a cohesive team

environment, and that these types of comments only bred resentment and animosity between co-workers.  (Defs. Rule 56.1 Stmt. ¶ 30;  5/29/06 Ramos Email.)

On May 31, 2006, defendant Carol David received a memorandum from Janet Vazquez, along with supporting documentation, for disciplinary review of Sicular, and a recommendation for Sicular's termination.  (Defs. Rule 56.1 Stmt. ¶ 41; Ex. Y: 5/31/06 Vazquez Memo & Documentation.)  Annexed to Vazquez's memorandum as supporting documentation was: a May 22, 2006 memorandum from defendant Ramos to Ajasin regarding Sicular's lateness and inappropriate conduct with a manager (Ex. Y: 5/22/06 Ramos Memo); defendant Ramos' May 29, 2006 email to Ajasin regarding the incident on Memorial Day; the April 30, 2006 counseling memorandum from defendant Ramos to Sicular, with supporting time records; the May 1, 2006 conference memorandum from defendant Rodriguez to Sicular; Sicular's "rebuttal" to the May 1, 2006 conference memorandum (Ex. Y: 5/1/06 Sicular Rebuttal); the article with commentary Sicular distributed; the March 30, 2006 email from defendant Rodriguez to Iris Rodriguez regarding Sicular's inappropriate and unprofessional behavior; and Sicular's handwritten March 29, 2006 letter of complaint to Iris Rodriguez.  (Defs. Rule 56.1 Stmt. ¶ 42; Ex. Y: 5/31/06 Vasquez Memo & Supporting Documentation.)

On July 5, 2006, defendant Ramos again counseled Sicular regarding his numerous instances of lateness on May 3, 7, 10, 28, and 30, and June 1, 14, 27, and 29, 2006.  (Defs. Rule 56.1 Stmt. ¶ 31; Ex. T: 7/5/06 Ramos Memo.)  Sicular concedes that he was late on those occasions. (Defs. Rule 56.1 Stmt. ¶ 32; Ex. B: Sicular Dep. at 108-09.)  Defendant Ramos advised Sicular "that

further similar conduct on your part may necessitate formal disciplinary action." (Defs. Rule 56.1 Stmt. ¶ 31; Ex. T: 7/5/06 Ramos Memo.)

On July 17, 2006, Sicular and his partner were issued a DHS Nextel cellphone. (Defs. Rule 56.1 Stmt. ¶ 33; Ex. U: 7/17/06 Barreras Memo.) Upon returning to PATH, Sicular indicated that he "possibly left it at a candy store," but that when he returned to the location, it was no longer there. (Defs. Rule 56.1 Stmt. ¶ 33; 7/17/06 Barreras Memo.) Supervisor Barreras advised Sicular that his actions were in direct violation of DHS rules and regulations, which state that "all employees are responsible for <u>loss</u>, theft or destruction of City and/or Department equipment." (Defs. Rule 56.1 Stmt. ¶ 33; 7/17/06 Barreras Memo.) Sicular admits that the Nextel device was lost, and that he took responsibility for its loss. (Defs. Rule 56.1 Stmt. ¶ 34; Ex. B: Sicular Dep. at 83-84.)

On August 8, 2006, Sicular's partner Edward Orji complained to defendant Rodriguez about numerous statements Sicular had made which Orji believed indicated Sicular's negative views on foreigners and minorities. (Defs. Rule 56.1 Stmt. ¶ 35; Ex. V: 8/8/06 Orji Email.) Orji wrote that Sicular stated that Orji was "'hungry for the job'" and that Sicular stated that "'all you foreigners are here for the money and don't care about yourselves.'" (Defs. Rule 56.1 Stmt. ¶ 35; 8/8/06 Orji Email.) Orji also wrote that Sicular asked him whether he came to America through the "'green card lottery.'" (Defs. Rule 56.1 Stmt. ¶ 35; 8/8/06 Orji Email.) Further, Orji complained that Sicular had called him a robot, which Orji took to be an insult "in the highest degree." (Defs. Rule 56.1 Stmt. ¶ 35; 8/8/06 Orji Email; Ex. B: Sicular Dep. at 122.) As a result of Sicular's offensive statements, Orji felt that Sicular did not see him or treat him as an equal, and he requested not to be partnered

with Sicular again.  (Defs. Rule 56.1 Stmt. ¶ 35; 8/8/06 Orji Email.)  Sicular admitted that he was

bothered by individuals he perceived to be foreign workers at DHS, some of whom he believed came

through a "green card lottery."  (Defs. Rule 56.1 Stmt. ¶ 36; Ex. B: Sicular Dep. at 54-58.)

On August 10, 2006, as a result of the DHS internal investigation regarding Sicular's

comments about foreigners, Denise Benson, Director of the DHS Office of Equal Opportunity

Affairs, met with Sicular, informed him of the DHS Equal Employment Opportunity policy and the

need to treat other employees in a professional and respectful manner, and told Sicular that he was

expected to adhere to the EEO policy.  (Defs. Rule 56.1 Stmt. ¶ 37; Ex. W: 8/10/06 Benson Memo;

Ex. X: 8/10/06 Sicular EEO Acknowledgment Form.)

That same day, August 10, 2006, defendant David wrote a memorandum (with

attached documentation) to Silvia Montalban, DHS Director of Personnel Services, recommending

Sicular's termination as a result of Sicular's instances of lateness, and his inappropriate comments

on gender, national origin and race.  (Defs. Rule 56.1 Stmt. ¶ 47; Ex. Z: 8/10/06 David Memo.)[3]

---

[3]     At DHS, a probationary fraud investigator may only be terminated after the fraud
investigator's direct supervisors, the PATH manager or deputy director, Carol David's
assistants and, finally, defendant Carol David reviews the employee's work performance and
meet regarding the employee.  (Defs. Rule 56.1 Stmt. ¶ 38; Ex. D: David Dep. at 53-54.)  To
initiate this process, the probationary employee's supervisors present documentation to
defendant David in reference to the employee's misconduct and the employee's status.  (Defs.
Rule 56.1 Stmt. ¶ 39; David Dep. at 53-54.)  Before writing a recommendation to terminate
an employee, defendant David reviews the totality of the circumstances, finds out the
employee's status, the proper termination procedures for the specific employee and meets
with the employee's supervisors.  (Defs. Rule 56.1 Stmt. ¶ 40; David Dep. at 54.)

Defendant David followed this procedure in Sicular's case.  (Defs. Rule 56.1 Stmt.
(continued...)

On August 11, 2006, Silvia Montalban presented a letter to Sicular informing him that his employment as a probationary Fraud Investigator with DHS was terminated.  (Defs. Rule 56.1 Stmt. ¶ 48; Ex. AA: 8/11/06 Montalban Letter.)

## Sicular's Internal Complaint

On May 1, 2006, several months before he was terminated, Sicular wrote a letter to defendant David complaining about his treatment by defendant Rodriguez.  (Defs. Rule 56.1 Stmt. ¶ 49; Ex. B: Sicular Dep. at 91-93; Ex. D: David Dep. at 51; Ex. BB: 5/1/06 Sicular Letter.)  Sicular wrote that Rodriguez

> has clearly created a hostile work environment for me.  She bristles with hostility whenever I come near her.  She never had a smile or a kind word. . . .
>
> Frankly, I don't know if she has something against Jews, whites, men or all of the above or maybe she is going through some personal problems but I for one don't enjoy working with someone of her ilk.

---

[3]/      (...continued)

¶ 40; David Dep. at 54.)   After defendant David received Vazquez's May 31, 2006 memorandum and supporting documentation, defendant David met with Sicular's supervisors and had discussions with DHS labor relations personnel.  (Defs. Rule 56.1 Stmt. ¶ 43; David Dep. at 55-56.)  Sicular's supervisors told defendant David that Sicular was not doing his job properly, that he conducted himself inappropriately on field investigations and that he did not perform field investigations properly.  (Defs. Rule 56.1 Stmt. ¶ 44; David Dep. at 18.) Specifically, defendant David recalls that Sicular complained about completing his tasks, did not want to enter certain buildings and did not complete documents in a timely manner.  (Defs. Rule 56.1 Stmt. ¶ 44; David Dep. at 18.)  After meeting with Sicular's supervisors and DHS disciplinary personnel, the decision was made to terminate Sicular.  (Defs. Rule 56.1 Stmt. ¶ 45; David Dep. at 56.)  Defendant David testified that Sicular's termination was not based solely on his time and attendance.  (Defs. Rule 56.1 Stmt. ¶ 46; David Dep. at 63.)

(Ex. BB: 5/1/06 Sicular Letter.)  David forwarded the letter to the DHS Equal Opportunity Affairs Office.  (Defs. Rule 56.1 Stmt. ¶ 49; Sicular Dep. at 93; David Dep. at 51.)

On May 31, 2006, Sicular discussed his complaint involving defendant Rodriguez with the DHS Equal Opportunity Affairs Office.  (Defs. Rule 56.1 Stmt. ¶ 51; Ex. CC: 5/31/06 Benson Memo.)  Patricia Gordon of the EEO Office memorialized that Sicular had indicated that things had improved since sending in his complaint and that Sicular stated that he wished to hold off on any investigation.  (Defs. Rule 56.1 Stmt. ¶ 51; Ex. D: 6/2/06 Inquiry Sheet.)  Sicular signed a withdrawal of his discrimination complaint.  (Defs. Rule 56.1 Stmt. ¶ 52;  Ex. DD: 6/2/06 Inquiry Sheet; Ex. EE: 5/31/06 Withdrawal of Discrimination Complaint.)  Defendant Rodriguez testified that she was unaware that Sicular had filed this internal EEO complaint against her.  (Ex. K: Rodriguez Dep. at 45-41; <u>see</u> Sicular Dep. at 96 (he has no personal knowledge that his EEO complaint was communicated to defendant Rodriguez).)

### Sicular's Office of Collective Bargaining Petition

On December 11, 2006, two months after he was terminated, Sicular filed a "Verified Improper Practice Petition" with the Office of Collective Bargaining against his union, the City and DHS.  (Defs. Rule 56.1 Stmt. ¶ 53; Ex. FF: Verified Improper Practice Petition; Ex. B Sicular Dep. at 15-17.)  Sicular alleged that his probationary employment with DHS was terminated due to his union activity, including representing fellow employees with grievances over working conditions; Sicular also alleged that his union breached its duty of fair representation.  (Defs. Rule 56.1 Stmt. ¶ 53; Verified Improper Practice Petition.)

On September 25, 2007, the Office of Collective Bargaining denied Sicular's petition in its entirety.  (Defs. Rule 56.1 Stmt. ¶¶ 57; Ex. II: OCB Decision & Order.)

**Sicular's CCHR/EEOC Complaint**

On May 17, 2007, 279 days after he was terminated, Sicular filed a Verified Complaint of discrimination with the New York City Commission on Human Rights ("CCHR") against defendants DHS, Ramos and Rodriguez.   (Defs. Rule 56.1 Stmt. ¶ 59; Ex. B: Sicular Dep. at 125-26; Ex. JJ: Sicular CCHR Compl.)  Sicular complained that defendants DHS, Ramos and Rodriguez discriminated against and terminated him on the basis of his race (Caucasian) and religion (Jewish). (Defs. Rule 56.1 Stmt. ¶ 59; Sicular CCHR Compl. ¶¶ 6-8.)  Sicular complained that he was subject to "disparate treatment" through a denial of access to computers and falsely accusing him of infractions. (Defs. Rule 56.1 Stmt. ¶ 59; Sicular CCHR Compl. ¶ 6.)  Sicular's CCHR complaint was cross-filed with the EEOC.  (Sicular CCHR Compl. ¶ 9.)

On October 15, 2007, Sicular filed an amended CCHR complaint, to include allegations that defendants DHS, Ramos and Rodriguez had discriminated against and fired him on the basis of his "age, race, religion, and in retaliation." (Defs. Rule 56.1 Stmt. ¶ 60; Ex. KK: Sicular Am. CCHR Compl. ¶¶ 1, 9-10.)

On December 21, 2007, DHS responded to Sicular's CCHR complaints.  (Defs. Rule 56.1 Stmt. ¶ 61; Ex. LL: 12/21/07 DHS Letter & Attachments.)   The CCHR conducted an investigation into Sicular's allegations including interviewing Sicular, Ramos and Rodriguez. (Defs.

Rule 56.1 Stmt. ¶ 62; Ex. B: Sicular Dep. at 126-27; Ex. K: Rodriguez Dep. at 67-68; Ex. MM: 7/28/08 CCHR Determination & Order at 4.)

On July 28, 2008, the CCHR issued a Determination and Order finding no probable cause to believe that DHS had engaged in the unlawful discriminatory practices alleged. (Defs. Rule 56.1 Stmt. ¶ 62; Ex. MM: 7/28/08 CCHR Determination & Order at 1, 5; Ex. B: Sicular Dep. at 128.) Specifically, the CCHR found that Sicular's "age, race, and religion were not motivating factors in his termination nor was he subject to disparate treatment during the course of his employment." (Defs. Rule 56.1 Stmt. ¶ 64; 7/28/08 CCHR Determination & Order at 5.) Further, the CCHR found that Sicular was not denied access to DHS equipment. (Defs. Rule 56.1 Stmt. ¶ 64; 7/28/08 CCHR Determination & Order at 5.) Additionally, the CCHR did not uncover any evidence of any false allegations of misconduct as Sicular had alleged. (Defs. Rule 56.1 Stmt. ¶ 64; 7/28/08 CCHR Determination & Order at 5.) Lastly, the CCHR found that, even if it credited Sicular's allegation that he was subject to two or three discriminatory comments, this was insufficient to prevail on a claim of severe or pervasive discriminatory harassment. (Defs. Rule 56.1 Stmt. ¶ 64; 7/28/08 CCHR Determination & Order at 5.) As to Sicular's age discrimination claim, the CCHR found that out of the 133 Fraud Investigators employed by DHS in March 2008, sixty-eight Fraud Investigators were over the age of forty years old, and thirteen of those employees were fifty-nine years old and older, Sicular's age at the time he was hired by DHS. (Defs. Rule 56.1 Stmt. ¶ 65; 7/28/08 CCHR Determination & Order at 4.) Further, the CCHR noted that only seven months elapsed between Sicular's hire and his termination, and, as such, the CCHR did "not credit the

allegation that age discrimination motivated his dismissal."   (Defs. Rule 56.1 Stmt. ¶ 65; 7/28/08 CCHR Determination & Order at 4.)  The CCHR concluded that Sicular "was terminated because of his lateness, negative interactions with coworkers and insubordination." (Defs. Rule 56.1 Stmt. ¶ 66; 7/28/08 CCHR Determination & Order at 5.)  The CCHR further found that DHS had "legitimate business reasons to terminate [Sicular] based on an evaluation of his performance, his failure to safeguard agency property, and discriminatory comments to coworkers and supervisors." (Defs. Rule 56.1 Stmt. ¶ 66; 7/28/08 CCHR Determination & Order at 5.)[4/]

On September 5, 2008, the United State Equal Employment Opportunity Commission informed Sicular that it had "adopted the findings of the state or local fair employment practices agency that investigated his charge," and that he had ninety days to file suit in federal court.  (Defs. Rule 56.1 Stmt. ¶ 69; Ex. PP: EEOC Dismissal & Right to Sue Notice.)

**Sicular's Deposition Testimony**

On September 17, 2009, defense counsel took Sicular's deposition.  (See Ex. B: Sicular Dep.)

Sicular claimed that he believed he had been discriminated against based on his gender because Ramos told him he could not wear shorts to work, while female Fraud Investigators

---

[4/]     On August 26, 2008, Sicular wrote a letter to the Chair of the CCHR appealing CCHR's July 28, 2008 Determination and Order.  (Defs. Rule 56.1 Stmt. ¶ 67; Ex. B: Sicular Dep. at 129; Ex. NN: 8/26/08 Sicular Letter.)  On January 13, 2009, CCHR Commissioner Patricia L. Gatling affirmed the prior no probable cause determination.  (Defs. Rule 56.1 Stmt. ¶ 68; Ex. OO: CCHR Determination & Order After Review; see Sicular Dep. at 129-30.) Commissioner Gatling notified Sicular that he had thirty days to seek review in State Supreme Court.  (CCHR Determination & Order After Review.)

were allowed to wear shorts to work.  (Ex. B: Sicular Dep. at 63, 139.)  It was Sicular's perception, but he has no evidence, that the women were not written up for wearing shorts.  (Sicular Dep. at 63.)

Sicular stated that he was subjected to unequal terms and conditions of employment on the basis of his race, because he was one of only a handful of Caucasian Fraud Investigators, and other employees, who are not Caucasian, had worse attendance problems than Sicular but were not terminated.  (Ex. B: Sicular Dep. at 132.)  Sicular points to the fact that African American probationary Fraud Investigators employed at PATH during the time he was employed by DHS had worse time and leave records:  Marjorie Smith, Robin Dickerson and Jennifer Baker.  (Sicular Dep. at 112, 132-33.)[5]  Sicular does not know if they received counseling memos.  (Sicular Dep. at 68, 112-13.)  Sicular is unaware of whether any of these employees had the same record of misconduct, insubordination and inappropriate behavior as he did.  (Sicular Dep. at 113, 132-33, 135-36, 148-49.)  Sicular is also unaware of whether Smith, Dickerson or Baker received the same complaints, counseling and written warnings Sicular received.  (Id.)

As to his religion, Sicular stated only that he "possibly" was discriminated against because of his religion.  (Ex. B: Sicular Dep. at 132.)  Sicular testified that he initially thought that his co-workers "probably don't even know I'm a Jew."  (Sicular Dep. at 144.)  But he stated that "maybe once every four weeks" he heard anti-Semitic remarks, such as "Jewed you down" (meaning to get a lower price).  (Sicular Dep. at 142-44.)  Sicular admits that upon hearing these types of

---

[5]     Defendant Ramos testified that while she supervised Sicular's time and leave records and counseled Sicular on his numerous instances of lateness, she did not supervise employees Dickerson or Smith.  (Ex. R: Ramos Dep. at 14, 17.)

remarks, he would make a joke about his religion and "let it go" because he felt the comments were "being made out of ignorance and [were] not really malicious." (Sicular Dep. at 143.) Furthermore, Sicular stated that the comments were mostly made by co-workers; he was unable to recall any supervisor who made any anti-Semitic comments. (Sicular Dep. at 190.) Sicular conceded that the remarks about religion "didn't really affect the work environment." (Sicular Dep. at 150-51.) However, he stated that he came to believe that his being Jewish "play[ed] into some of the prejudices that some of the management people had." (Sicular Dep. at 154.) Sicular stated that his religion reinforced defendants Ramos, Rodriguez, David and supervisor Barclay's previous animosity towards him. (Sicular Dep. at 154-57.) Sicular noted that although he felt he was subject to "some coolness" because he was the only Jewish Fraud Investigator there, "[i]t's something that you can't really prove." (Sicular Dep. at 157.) Specifically, as to defendant Ramos, Sicular stated: "I don't think he liked me to begin with. And now I am speculating, now that he knows that I'm Jewish, I don't think he likes me more. How can I prove it? It's hard to prove. I don't know how to prove that." (Sicular Dep. at 154-55.) Similarly, as to defendant Rodriguez, Sicular testified that: "I can't prove anything, but I think I gave her more reason to act with animosity toward me [because I am Jewish], something that I can't really prove." (Sicular Dep. at 155.) Similarly, as to defendant Carol David, Sicular said that he thought his being Jewish "reinforced her prejudice and dislike for me," but admitted that "this is all speculation that I can't prove or substantiate." (Sicular Dep. at 157.)

Sicular claims that defendants created a hostile work environment through his four counseling sessions, his supervisors "ignor[ing]" him, his Nextel phone "mysteriously" disappearing

and the fact that he was terminated.  (Ex. B: Sicular Dep. at 75, 162-63.)  Sicular also alleges that

he was "verbally abused" by defendants Ramos and Rodriguez.  (Sicular Dep. at 136-37.)  Sicular

alleged that defendant Rodriguez verbally abused him by saying "get up, get out" to him at the

beginning of one of his shifts, and that she told him to not come into her office.  (Sicular Dep. at 74-

77, 136-37.)  Sicular believes that defendant Ramos once implied that he was a member of the Ku

Klux Klan, and based this belief on defendant Ramos asking him if he left his "cape at the door."

(Sicular Dep. at 137.)  Sicular also claims that the fact that supervisors did not say hello to him was

"a form of hostility."  (Sicular Dep. at 139-40, 142, 147.)

As to his age claim, Sicular testified that he was one of the few Fraud Investigators

that were 60 years old or more, and that age "might have been a contributing factor, because it's a

youth culture that we live in."  (Ex. B: Sicular Dep. at 134.)  As to evidence, Sicular said he "can't

give you a real specific thing, except to say that [he] wasn't given much respect."  (Sicular Dep. at

134, 160-61.)

With respect to his retaliation claim, Sicular complains that defendants retaliated

against him for the May 1, 2006 internal complaint to David of discrimination by defendant

Rodriguez.  (Ex. B: Sicular Dep. at 145.)  Sicular believes that his internal complaint regarding

defendant Rodriguez was the reason he was terminated.  (Sicular Dep. at 145.)

Finally, Sicular testified that the basis for his NYSHRL and NYCHRL claims were

the same as for his Title VII claims.  (Ex. B: Sicular Dep. at 135.)

## ANALYSIS

I.   **SUMMARY JUDGMENT STANDARD**

   A.   **The General Summary Judgment Standard**

   Rule 56(c) of the Federal Rules of Civil Procedure provides that summary "judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Lang v. Ret. Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

   The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

   To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Instead, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e);  accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct.

at 1356; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (At summary judgment,

"[t]he time has come . . . 'to put up or shut up.'") (citations omitted), cert. denied, 540 U.S. 811, 124

S. Ct. 53 (2003).

   In evaluating the record to determine whether there is a genuine issue as to any

material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are

to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[6]

The Court draws all inferences in favor of the nonmoving party only after determining that such

inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v.

DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to

the issue on which summary judgment is sought, there is any evidence in the record from any source

from which a reasonable inference could be drawn in favor of the nonmoving party, summary

judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

   In considering a motion for summary judgment, the Court is not to resolve contested

issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See,

e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S.

Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To

evaluate a fact's materiality, the substantive law determines which facts are critical and which facts

---

[6] See also, e.g., Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM
Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d
at 1223.

are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

"The Court recognizes that it must 'must extend extra consideration' to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions." Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) (Peck, M.J.) (citations & internal quotations omitted); see, e.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be read liberally and interpreted "'to raise the strongest arguments that they suggest'").[7/]  "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  Cole v. Artuz, 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[8/]

---

[7/]  See also, e.g., Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006); Fuller v. Armstrong, 204 Fed. Appx. 987, 988 (2d Cir. 2006), cert. denied, 128 S. Ct. 209 (2007); Gildor v. U.S. Postal Serv., 179 Fed. Appx. 756, 758 (2d Cir. 2006); Porter v. Coughlin, 421 F.3d 141, 144 n.2 (2d Cir. 2005); Hemphill v. New York, 380 F.3d 680, 687 (2d Cir. 2004); Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003); Johnson v. Buffalo Police Dep't, 46 Fed. Appx. 11, 12 (2d Cir. 2002), cert. denied, 539 U.S. 959, 123 S. Ct. 2645 (2003).

[8/]  See also, e.g., United States v. Acomb, No. 99-6308, 216 F.3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); James v. Phillips, 05 Civ. 1539, 2008 WL 1700125 at *3 (S.D.N.Y. Apr. 9, 2008); Thompson v. Tracy, 00 Civ. 8360, 2008 WL 190449 at *5
(continued...)

**B.      Additional Summary Judgment Standards in Employment Discrimination Cases**

When a case turns on the intent of one party, as employment discrimination claims often do, a "trial court must be cautious about granting summary judgment."  <u>Gallo</u> v. <u>Prudential Residential Servs., Ltd. P'Ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).[9/]  Because the employer rarely leaves direct evidence of its discriminatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. <u>E.g.</u>, <u>Gallo</u> v. <u>Prudential Residential Srvs., Ltd. P'Ship</u>, 22 F.3d at 1224.  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." <u>Danzer</u> v. <u>Norden Sys., Inc.</u>, 151 F.3d 50, 54 (2d Cir. 1998) (citations

---

[8/]      (...continued)
(S.D.N.Y. Jan. 17, 2008); <u>Bunting</u> v. <u>Nagy</u>, 452 F. Supp. 2d 447, 454 (S.D.N.Y. 2006); <u>Rodriguez</u> v. <u>McClenning</u>, 399 F. Supp. 2d 228, 234 & n.52 (S.D.N.Y. 2005); <u>Pack</u> v. <u>Artuz</u>, 348 F. Supp. 2d 63, 78 (S.D.N.Y. 2004); <u>Rector</u> v. <u>Sylvania</u>, 285 F. Supp. 2d 349, 353 (S.D.N.Y. 2003); <u>Walker</u> v. <u>Vaughan</u>, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002); <u>Hussein</u> v. <u>The Waldorf-Astoria</u>, 134 F. Supp. 2d 591, 596 (S.D.N.Y. 2001), <u>aff'd</u>, 31 Fed. Appx. 740 (2d Cir. 2002).

[9/]      <u>Accord</u>, <u>e.g.</u>, <u>Feingold</u> v. <u>New York</u>, 366 F.3d 138, 149 (2d Cir. 2004); <u>Kerzer</u> v. <u>Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998) ("in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment"); <u>McLee</u> v. <u>Chrysler Corp.</u>, 109 F.3d 130, 135 (2d Cir. 1997) ("caution must be exercised in granting summary judgment where motive is genuinely in issue"); <u>Cardoza</u> v. <u>Healthfirst, Inc.</u>, 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999); <u>see also</u>, <u>e.g.</u>, <u>Chambers</u> v. <u>TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 40 (2d Cir. 1994).

omitted).  Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. E.g., Budde v. H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).  In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  Stern v. Trustees of Columbia Univ., 131 F.3d at 312; see, e.g., Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (The question on summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.") (internal quotations & alterations omitted), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[10]  Indeed, the Second

---

[10]    See also, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652, 654 (2d Cir. 1997).

Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" Weinstock v. Columbia Univ., 224 F.3d at 41.

## II.   SICULAR'S TITLE VII AND ADEA CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED

It is black letter law in this Circuit that individuals, as opposed to the employing entity, cannot be held liable under Title VII, the ADA or the ADEA.  See, e.g., Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); accord, e.g., Darcy v. Lippman, No. 08-2293-CV, 2009 WL 3416168 at *1 (2d Cir. Oct. 22, 2009);  Ziegler v. Adams, 316 Fed. Appx. 52, 52 (2d Cir. 2009); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 n.8 (2d Cir. 2006); Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 195 n.2 (2d Cir. 2005); Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004); Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003); Cherry v. Toussaint, 50 Fed. Appx. 476, 477 (2d Cir. 2002).[11]

---

[11]   See, e.g., Ajayi v. Dep't of Homeless Servs., 08 Civ. 3649, 2009 WL 1704329 at *7 (S.D.N.Y. June 18, 2009) (Peck, M.J.) (& cases cited therein); Brown v. Research Found. of SUNY, No. 08-CV-592, 2009 WL 1504745 at *10 n.15 (N.D.N.Y. May 28, 2009); Alston v. Microsoft Corp., 08 Civ. 3547, 2009 WL 1116360 at *8 n.2 (S.D.N.Y. Apr. 27, 2009); Hargett v. Metro. Transit Auth., 552 F. Supp. 2d 393, 407 (S.D.N.Y. Apr. 7, 2008); Ocasio v. Riverbay Corp., 06 Civ. 6455, 2007 WL 1771770 at *7 (S.D.N.Y. June 19, 2007);  Pozo v. J & J Hotel Co., 06 Civ.2004, 2007 WL 1376403 at *14 (S.D.N.Y. May 10, 2007) (Peck, M.J.); Harris v. Mills, 478 F. Supp. 2d 544, 547 (S.D.N.Y. 2007), aff'd, 572 F.3d 66 (2d Cir. 2009); Lennon v. NYC, 392 F. Supp. 2d 630, 640 (S.D.N.Y. 2005); Dodson v. CBS Broad. Inc., 02 Civ. 9270, 2004 WL 1336231 at *27 (S.D.N.Y. June 15, 2004) (Peck, M.J.) (citing cases); Parker v. Metro. Transp. Auth., 97 F. Supp. 2d 437, 452 (S.D.N.Y. 2000).

Accordingly, plaintiff Sicular's federal Title VII and ADEA claims against the individual defendants (Carol David, Maria Rodriguez and Raymond Ramos) should be dismissed.

## III.   THIS COURT LACKS JURISDICTION WITH RESPECT TO SICULAR'S CLAIMS OF GENDER DISCRIMINATION

"Under both Title VII and the ADEA, a claimant may bring suit in federal court only if she has filed a timely complaint with the EEOC. . . ."  Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001); see also, e.g., 42 U.S.C. § 2000e-5(e) & (f); 29 U.S.C. § 626(d).[12]  "Exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII and ADEA statutory schemes and, as such, a precondition to bringing such claims in federal court."  Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d at 686; Francis v. City of N.Y., 235 F.3d 763, 768 (2d Cir. 2000); Malarkey v. Texaco, Inc., 983 F.2d at 1208.

"While a plaintiff's EEOC charge should be construed liberally, especially for a pro se plaintiff, there is a difference between liberally reading a claim which lacks specificity, and inventing, ex nihilo, a claim which simply was not made."  Williams v. City of N.Y., 2005 WL 839103 at *8 (quotations omitted); accord, e.g., Adeniji v. Admin. for Children Servs., 43 F. Supp. 2d 407, 427 (S.D.N.Y.) (Wood, D.J. & Peck, M.J.), aff'd No. 99-7561, 201 F.3d 430 (table), 1999

---

[12]      See also, e.g., Shah v. N.Y.S. Dep't of Civil Serv., 168 F.3d 610, 613 (2d Cir. 1999); Malarkey v. Texaco, Inc., 983 F.2d 1204, 1208 (2d Cir. 1993); Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 23 (2d Cir.) ("No action based on a claim of age discrimination may be brought in federal court unless the claim was properly raised with the EEOC."), cert. denied, 474 U.S. 851, 106 S. Ct. 148 (1985); Smith v. Am. President Lines, Ltd., 571 F.2d 102, 105 (2d Cir. 1978) ("the filing of a timely EEOC charge is a necessary prerequisite to a Title VII action in the district court."); Pozo v. J&J Hotel Co., 06 Civ. 2004, 2007 WL 1376403 at *19 (S.D.N.Y. May 10, 2007) (Peck, M.J.); Williams v. City of N.Y., 04 Civ. 1993, 2005 WL 839103 at *7 (S.D.N.Y. Apr. 12, 2005) (Peck, M.J.) (& cases cited therein).

WL 1070027 (2d Cir. Nov. 18, 2009); Hernandez v. N.Y.C. Law Dep't, 94 Civ. 9042, 1997 WL 27047 at *8 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.).

Sicular's CCHR complaint (cross-filed with the EEOC) only raised claims of discrimination based on age, race and religion.  (See page 13 above.)  He did not raise an age discrimination claim before the CCHR/EEOC.  (Id.)

The Second Circuit recognizes, however, that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency."  Shah v. N.Y.S. Dep't of Civil Serv., 168 F.3d at 614; see also, e.g., Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d at 686; Malarkey v. Texaco, Inc., 983 F.2d at 1208-09; Pozo v. J&J Hotel Co., 2007 WL 1376403 at *20; Williams v. City of N.Y., 2005 WL 839103 at *7.  The Second Circuit has "recognized three situations in which claims not raised in an EEO charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action: 1) where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; 2) where the complaint is one alleging retaliation by an employer against an employee for filing an EEOC charge; and 3) where the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."  Terry v.

Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003) (quotations omitted).[13]  None of these elements are
present in the instant case.

       The first type of claim which may be considered "reasonably related" to a claim made
in an EEOC complaint is a claim that "would fall within the scope of the EEOC investigation which
can reasonably be expected to grow out of the charge that was made." Ximines v. George Wingate
High Sch., 516 F.3d 156, 158 (2d Cir. 2008).  The focus is therefore on the factual allegations made
in the EEOC charge itself which describes the discriminatory conduct.  Ximines v. George Wingate
High Sch., 516 F.3d at 158.  The question becomes whether the complaint filed with the EEOC gave
the agency adequate notice to investigate discrimination on additional bases.  Ximines v. George
Wingate High Sch., 516 F.3d at 158.  In Ximines, for example, the Second Circuit held that where
the plaintiff's EEOC complaint claimed that she was discriminated against in seeking to secure
promotion to assistant principal, that was sufficient to cover her federal claim that she also was
passed over for a specific later promotion.  Ximines v. George Wingate High Sch., 516 F.3d at 158-
59; see also, e.g., Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003) (plaintiff's race discrimination
claim was reasonably related to his EEOC charge of national-origin discrimination because, "read
liberally, allegations by an African-American employee that employees of Irish descent are receiving
preferential treatment implicitly suggests some form of potential racial discrimination in addition
to an illegitimate preference premised on national origin."); Gadbois v. Rock-Tenn Co., Mill

---

[13]    See also, e.g., Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d at 686; Hassan v.
NYC Off Track Betting Corp., 05 Civ. 9677, 2007 WL 678422 at *3 (S.D.N.Y. Mar. 6,
2007).

Division, Inc., 984 F. Supp. 811, 818 (D. Vt. 1997) (plaintiff's age discrimination claim was "reasonably related" to gender discrimination claim where EEOC complaint "referred to her twenty-five years of service several times, and outlined [defendant]'s decision to hire her back at $15,000 a year less than she was previously making.").

At his deposition, Sicular claimed that he believed he had been discriminated against based on his gender because he was allegedly told he could not wear shorts to work, while female Fraud Investigators were allowed to wear shorts.[14/] (See pages 15-16 above.) However, neither these facts, nor a gender claim generally, was ever raised by Sicular in his CCHR complaint. Sicular's CCHR complaint alleged that he had been discriminated against on the basis of his race and religion. (See page 13 above.) Sicular's amended CCHR complaint alleged that defendants discriminated against him on the basis of "age, race, religion and retaliation." (See page 13 above.) Sicular failed to amend his CCHR complaint to allege that defendants discriminated against him on the basis of his gender. Nothing in the CCHR's decision indicates that Sicular informed them about the facts of the alleged disparity between DHS allegedly allowing women but not him to wear shorts, or in any

---

[14/]   To the extent that Sicular argues that being "reprimanded" for wearing shorts is gender discrimination, this alleged reprimand does not rise to the level of an adverse employment action as it is not "a materially adverse change in the terms and conditions of employment." See Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) ("We have explained that an action must cause a 'materially adverse change in the terms and conditions of employment,' and not just 'mere inconvenience,' in order to qualify as 'adverse.'). "Examples of materially adverse changes include 'termination of employment, a demotion, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006).

other way put the CCHR on notice of a gender claim.  (<u>See generally</u> Ex. M: 7/28/08 CCHR

Decision & Order; Ex. NN: 8/26/08 Sicular CCHR Appeal Letter.)  As a result, Sicular's claim that

defendants discriminated against him on the basis of his gender was never investigated by the CCHR

(or the EEOC when it adopted the CCHR's findings).  (<u>See</u> pages 14-15 above.)

   The second type of claim that can be considered as "reasonably related" to a claim

previously made in an EEOC complaint is a claim "alleging retaliation by an employer against an

employee for filing an EEOC charge."  <u>Butts</u> v. <u>City of N.Y. Dep't of Hous. Pres. & Dev.</u>, 990 F.2d

1397, 1402 (2d Cir. 1993).  Sicular's CCHR retaliation claim had nothing to do with his having

asserted a claim of gender discrimination.  (<u>See</u> pages 13-15 above.)

   The third type of claim which may be considered "reasonably related" to a claim

previously made in an EEOC charge, "alleges further incidents of discrimination carried out in

precisely the same manner alleged in the EEOC charge."  <u>Butts</u> v. <u>City of N.Y. Dep't of Hous. Pres.

& Dev.</u>, 990 F.2d at 1402-03.  Since Sicular was terminated from DHS on August 11, 2006, before

he filed his May 2007 CCHR complaint and October 2007 amended CCHR complaint, his claim that

he was discriminated against on the basis of his gender could not have occurred after the filing of

his CCHR complaints, and therefore this type of "reasonably related" claim also is not applicable to

his current gender discrimination complaint.

   Sicular failed to file a charge alleging discrimination based upon his gender in

violation of Title VII prior to commencing this lawsuit, and as a matter of law, there is no evidence

to find that his new gender claim is "reasonably related" to his CCHR complaints alleging

discrimination on the basis of race, age, religion and retaliation.  Accordingly, this Court lacks

jurisdiction with respect to Sicular's claims of discrimination based on gender and these claims

should be dismissed.[15/]  E.g., Carter v. New Venture Gear, Inc., 310 Fed. Appx. 454, 458 (2d Cir.

2009) (dismissing gender discrimination claim where EEOC complaint only alleged race

discrimination); White v. N.Y.C. Dep't of Educ., No. 05-CV-2064, 2008 WL 4507614 at *1-3

(E.D.N.Y. Sept. 30, 2008) (dismissing plaintiff's gender discrimination claim where plaintiff only

alleged gender discrimination "in the context of depositions taken in this district court action and not

before the EEOC," because "[w]hile the 'reasonably-related' exception allows for 'loose pleading,'

it does not encompass claims based on an entirely different type of discrimination from what was

alleged in the initial EEOC charge"); see, e.g., Marshall v. N.Y.C. Bd. of Elections, 322 Fed. Appx.

17, 18 (2d Cir. 2009) (dismissing religious discrimination claim where EEOC complaint only alleged

race and gender discrimination and did not "include any incidents that would have allowed the

CCHR to investigate such allegations"); Sotolongo v. New York City Transit Auth., No. 99-9195,

216 F.3d 1073 (table), 2000 WL 777958 at *3 (2d Cir. June 15, 2000) (ADA claim dismissed where

plaintiff only asserted Title VII and ADEA claims in EEOC charge, and ADA claim was not

---

[15/]      The Court also notes that although Sicular only worked for DHS for six months – from
February 20, 2006 until August 11, 2006 – much of that time period is outside the limitations
period.  Title VII and the ADEA require a claimant to file a charge of discrimination with the
EEOC (or state or city agency) within 300 days of the alleged discriminatory employment
action, and claims for acts that occurred more than 300 days before the filing are time-barred
in federal court.  See, e.g., Ajayi v. Dep't of Homeless Servs., 08 Civ. 3649, 2009 WL
1704329 at *7 (S.D.N.Y. June 18, 2009) (Peck, M.J.) (& statutes and cases cited therein).
Sicular filed with the CCHR on May 17, 2007.  (See page 13 above.)  Thus, any claims for
the period before July 21, 2006 are time-barred.

reasonably related to other claims cited in EEOC charge); <u>Wali</u> v. <u>One Source Co.</u>, --- F. Supp. 2d ---, 07 Civ. 7550, 2009 WL 5247505 at *11 (S.D.N.Y. Dec. 30, 2009) (dismissing religious discrimination claim where EEOC complaint alleged racial discrimination and mere fact that plaintiff's "name may appear to be a Muslim name" was not enough to put the EEOC on notice of such claims); <u>Ford</u> v. <u>N.Y.C. Dep't of Health & Mental Hygiene</u>, 545 F. Supp. 2d 377, 391 (S.D.N.Y. 2008) (Chin, D.J.) (dismissing racial discrimination claim which "bears no factual relation to [the] allegations" in her EEOC complaint), <u>aff'd</u>, No. 08-2510-CV, 2009 WL 3651964 (2d Cir. Nov. 5, 2009).[16]

## IV.   GOVERNING LEGAL STANDARD FOR TITLE VII AND ADEA CASES

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §§ 2000e-2(a)(1).

---

[16]   <u>See also</u>, <u>e.g.</u>, <u>Pozo</u> v. <u>J&J Hotel Co.</u>, 2007 WL 1376403 at *20 (age discrimination claim dismissed where EEOC complaint only alleged race, national origin and religious discrimination); <u>Hassan</u> v. <u>NYC Off Track Betting Corp.</u>, 2007 WL 678422 at *3 (dismissing ADEA and ADA claims where plaintiff asserted only Title VII claim in his EEOC charge); <u>Williams</u> v. <u>City of N.Y.</u>, 2005 WL 839103 at *7-9 (granting summary judgment to defendants on claims of age and race discrimination not raised in plaintiff's NYCHR complaint which also served as plaintiff's EEOC Charge.); <u>Punsal</u> v. <u>Mount Sinai Servs. of the Mount Sinai Sch. of Med.</u>, 01 Civ. 5410, 2004 WL 736892 at *5 (S.D.N.Y. Apr. 6, 2004) (age discrimination claim dismissed where plaintiff only asserted national origin discrimination in SDHR/EEOC complaint, and age discrimination claim was not reasonably related to national origin discrimination claim); <u>Joseph</u> v. <u>Am. Works, Inc.</u>, 01 Civ. 8287, 2002 WL 1033833 at *5-6 (S.D.N.Y. May 21, 2002) (ADA claim dismissed where plaintiff only asserted Title VII claims in her EEOC complaint, and ADA claim was not reasonably related to Title VII claims).

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

In connection with discrimination claims under Title VII and ADEA, the Second Circuit applies the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).[17/]  See, e.g., Leibowitz v. Cornell

---

[17/]    Employment discrimination claims brought under the NYSHRL and the NYCHRL also are analyzed using the McDonnell Douglas analysis. E.g., Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) ("Age discrimination claims brought pursuant to the NYSHRL and NYCHRL are analyzed under the ADEA framework, just as . . . discrimination claims brought pursuant to the NYSHRL, and the NYCHRL are analyzed under the Title VII framework.") (citations omitted); Fall v. N.Y.S. United Teachers, 289 Fed. Appx. 419, 422 (2d Cir. 2008) ("The McDonnell Douglas burden-shifting analysis 'is also applicable to [the plaintiff's] claims under the NYSHRL.'"); Nader v. ABC Television, Inc., 150 Fed. Appx. 54, 55 (2d Cir. 2005) ("The New York State Human Rights Law and New York City Administrative Code are governed by the same analytical framework" as the ADA.) (citations omitted); Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 n.1 (2d Cir. 2000); John v. Dep't of Info. Tech. & Telecomm., 06 Civ. 13119, 2008 WL 4694596 at *3 (S.D.N.Y. Oct. 23, 2008) (McDonnell Douglas analysis applies to New York State and New York City Human Rights Law claims.); Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n.3, 786 N.Y.S.2d 382, 391 n.3 (2004) ("The standards for recovery under the New York State Human Rights Law are the same as the federal standards under [T]itle VII of the Civil Rights Act of 1964.  Thus, '[b]ecause both the Human Rights Law and [T]itle VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal.'  Further, the human rights provisions of the New York City Administrative Code mirror the provisions of the [New York State] Executive Law and should therefore be analyzed according to the same standards.") (citations omitted); Ferrante v. Am. Lung Ass'n, 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 28 (1997) (age discrimination case using the McDonnell Douglas burden-shifting approach: "The standards for recovery under section 296 of the Executive Law are in accord with Federal standards
(continued...)

Univ., 584 F.3d at 498; <u>Dorfman</u> v. <u>Doar Comm., Inc.</u>, No. 05-4926-CV, 2009 WL 648524 at *1 (2d

Cir. Mar. 12, 2009) (ADEA); <u>Desalvo</u> v. <u>Volhard</u>, 312 Fed. Appx. 394, 396 (2d Cir.) (ADEA), <u>cert.</u>

<u>denied</u>, 130 S. Ct. 70 (2009) (ADEA); <u>Fisher</u> v. <u>Vassar Coll.</u>, 70 F.3d 1420, 1449 (2d Cir. 1995)

(ADEA).

---

[17]/     (...continued)
under title VII of the Civil Rights Act of 1964."); <u>Miller Brewing Co.</u> v. <u>State Div. of Human</u>
<u>Rights</u>, 66 N.Y.2d 937, 938-39, 498 N.Y.S.2d 776, 778 (1984) (applying <u>Burdine/McDonnell</u>
<u>Douglas</u> analysis to age discrimination claim under NYSHRL).

     However, the NYCHRL is to be more liberally construed.  <u>E.g.</u>, <u>Williams</u> v. <u>New</u>
<u>York City Hous. Auth.</u>, 61 A.D.3d 62, 75, 872 N.Y.S. 2d 27, 37-38 (1st Dep't 2009); <u>see</u>
<u>also</u>, <u>e.g.</u>, <u>Hanna</u> v. <u>N.Y. Hotel Trades Council</u>, 18 Misc. 3d 436, 438 n.1, 851 N.Y.S.2d 818,
822 n.1 (Sup. Ct. N.Y. Co. 2007) ("NYCHRL is to be liberally and independently construed
with the aim of making it more protective than its federal . . . or state . . . counterparts.").  As
I previously explained:

     As this Court has pointed out several times, "while the cases . . . employ the same
     'federal' analysis to NYCHRL claims, the 'legislative history' of the NYCHRL makes
     clear that it is to be even more liberally construed than the federal and state anti-
     discrimination laws." <u>Brown</u> v. <u>Cushman & Wakefield, Inc.</u>, 01 Civ. 6637, 2002 WL
     1751269 at *22 n.38 (S.D.N.Y. July 29, 2002) (Peck, M.J.), <u>report & rec. adopted</u>,
     235 F. Supp. 2d 291 (S.D.N.Y. 2002); <u>accord</u>, <u>e.g.</u>, <u>Kennebrew</u> v. <u>N.Y.C. Hous.</u>
     <u>Auth.</u>, 01 Civ. 1654, 2002 WL 265120 at *7 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.)
     (quoting <u>Burger</u> v. <u>Litton</u>, 91 Civ. 0918, 1996 WL 421449 at *18-19 (S.D.N.Y. Apr.
     25, 1996) (Peck, M.J.), <u>report & rec. adopted</u>, 1996 WL 609421 (S.D.N.Y. Oct. 22,
     1996) (Knapp, D.J.)); <u>Weber</u> v. <u>Parfums Givenchy, Inc.</u>, 49 F. Supp. 2d 343, 355 &
     n.5 (S.D.N.Y. 1999) (Wood, D.J. & Peck, M.J.); <u>Hernandez</u> v. <u>N.Y.C. Law Dep't</u>, 94
     Civ. 9042, 1997 WL 27047 at *13-19 & n.10 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.);
     <u>see also</u> <u>Torres</u> v. <u>Pisano</u>, 116 F.3d 625, 629 n.1 (2d Cir.) (quoting <u>Burger</u>), <u>cert.</u>
     <u>denied</u>, 522 U.S. 997, 118 S. Ct. 563 (1997).

<u>Viruet</u> v. <u>Citizen Advice Bureau</u>, 01 Civ. 4394, 2002 WL 1880731 at *14 n.28 (S.D.N.Y.
Aug. 15, 2002) (Peck, M.J.).  Because the parties in this case have not argued for a different
result under the NYCHRL than the NYSHRL (or Title VII and the ADEA), and because
Sicular's NYSHRL and NYCHRL claims should be dismissed for other reasons (<u>see</u> Point
VII below), the Court will not pursue the issue any further in this case.

Under the familiar <u>McDonnell Douglas</u> burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." <u>Texas Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981); <u>see</u>, <u>e.g.</u>, <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000); <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. at 802, 93 S. Ct. at 1824.[18] Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. at 506, 113 S. Ct. at 2747 (quoting <u>Texas Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. at 254, 101 S. Ct. at 1094).[19]

Once a plaintiff claiming employment discrimination establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision.  <u>E.g.</u>, <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. at 142-43, 120 S. Ct. at 2106; <u>McDonnell Douglas Corp.</u> v. <u>Green</u>,

---

[18]  <u>See also</u>, <u>e.g.</u>, <u>Raytheon Co.</u> v. <u>Hernandez</u>, 540 U.S. 44, 50 n.3, 124 S. Ct. 513, 517 n.3 (2003); <u>O'Connor</u> v. <u>Consol. Coin Caterers Corp.</u>, 517 U.S. 308, 310, 116 S. Ct. 1307, 1309 (1996); <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47 (1993); <u>Leibowitz</u> v. <u>Cornell Univ.</u>, 584 F.3d at 498; <u>Dorfman</u> v. <u>Doar Comm., Inc.</u>, 2009 WL 648524 at *1; <u>Desalvo</u> v. <u>Volhard</u>, 312 Fed. Appx. at 396; <u>Fall</u> v. <u>N.Y.S. United Teachers</u>, 289 Fed. Appx. at 420-21; <u>Nader</u> v. <u>ABC Television, Inc.</u>, 150 Fed. Appx. at 55; <u>Mandell</u> v. <u>County of Suffolk</u>, 316 F.3d 368, 377-78 (2d Cir. 2003); <u>Mario</u> v. <u>P&C Food Mkts., Inc.</u>, 313 F.3d 758, 767 (2d Cir. 2002); <u>Collins</u> v. <u>N.Y.C. Transit Auth.</u>, 305 F.3d 113, 118 (2d Cir. 2002); <u>Schnabel</u> v. <u>Abramson</u>, 232 F.3d 83, 87 (2d Cir. 2000); <u>Chambers</u> v. <u>TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994).

[19]  <u>See also</u>, <u>e.g.</u>, <u>Mandell</u> v. <u>County of Suffolk</u>, 316 F.3d at 380; <u>Mario</u> v. <u>P&C Food Mkts., Inc.</u>, 313 F.3d at 767; <u>Scaria</u> v. <u>Rubin</u>, 117 F.3d 652, 654 (2d Cir. 1997).

411 U.S. at 802, 93 S. Ct. at 1824.[20/]  The burden on the defendant at this phase is one of production rather than persuasion.  E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142, 120 S. Ct. at 2106.[21/]

"Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106.

If the defendant articulates a non-discriminatory reason, the McDonnell Douglas burden-shifting framework drops out of the picture, and the plaintiff must show that the adverse employment decision more likely than not was motivated in whole or part by discriminatory reasons.

---

[20/]   See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; O'Connor v. Consol. Coin Caterers Corp., 517 U.S. at 310, 116 S. Ct. at 1309; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; Leibowitz v. Cornell Univ., 584 F.3d at 498-99; Dorfman v. Doar Comm., Inc., 2009 WL 648524 at *1; Desalvo v. Volhard, 312 Fed. Appx. at 396; Fall v. New York State United Teachers, 289 Fed. Appx. at 421; Nader v. ABC Television, Inc., 150 Fed. Appx. at 55; Feingold v. N.Y., 366 F.3d 138, 152 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Mandell v. County of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Schnabel v. Abramson, 232 F.3d at 88; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Stein v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38.

[21/]   See also, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Terry v. Ashcroft, 336 F.3d at 144 n.17; Scaria v. Rubin, 117 F.3d at 654.

E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106.[22]

"Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant

meets its burden of production, . . . the trier of fact may still consider the evidence establishing the

plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the

defendant's explanation is pretextual.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143,

120 S. Ct. at 2106 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255 n.10, 101 S. Ct.

at 1095 n.10).

       The Supreme Court in 2000 clarified the standard at this stage of the McDonnell

Douglas analysis:

> [I]n St. Mary's Honor Center . . . . we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."
>
> In reaching this conclusion, however, we reasoned that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .
>
> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite

---

[22]    See also, e.g., Raytheon Co. v. Hernandez, 124 S. Ct. at 517 n.3; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 510, 113 S. Ct. at 2749; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253, 101 S. Ct. at 1093-94; Leibowitz v. Cornell Univ., 584 F.3d at 499; Desalvo v. Volhard, 312 Fed. Appx. at 396; Fall v. N.Y.S. United Teachers, 289 Fed. Appx. at 421; Feingold v. New York, 366 F.3d at 152; Mandell v. County of Suffolk, 316 F.3d at 380-81; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Weinstock v. Columbia Univ., 224 F.3d at 42; Scaria v. Rubin, 117 F.3d at 654.

persuasive.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."  Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.  Thus, <u>a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated</u>.

> <u>This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability</u>.  Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.  To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

> <u>Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law</u>.

<u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. at 146-49, 120 S. Ct. at 2108-09 (emphasis added & citations omitted).

After <u>Reeves</u>, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the <u>McDonnell</u>

<u>Douglas</u> analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis

is necessary:

> In examining the impact of <u>Reeves</u> on our precedents, we conclude that <u>Reeves</u> prevents courts from imposing a <u>per se</u> rule requiring <u>in all instances</u> that a [Title VII] claimant offer more than a prima facie case and evidence of pretext. . . .  But the converse is not true; following <u>Reeves</u>, <u>we decline to hold that no [Title VII] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext.  Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach</u>, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

<u>Schnabel</u> v. <u>Abramson</u>, 232 F.3d at 90 (emphasis added).[23/]

---

[23/]   See also, e.g., <u>Butts</u> v. <u>NYC Dep't of Hous. Pres. & Dev.</u>, 307 Fed. Appx. 596, 599 (2d Cir. 2009); <u>Cross</u> v. <u>N.Y.C. Transit Auth.</u>, 417 F.3d 241, 248 (2d Cir. 2005); <u>Feingold</u> v. <u>New York</u>, 366 F.3d at 152; <u>Roge</u> v. <u>NYP Holdings, Inc.</u>, 257 F.3d 164, 167-68 (2d Cir. 2001); <u>Abdu-Brisson</u> v. <u>Delta Air Lines, Inc.</u>, 239 F.3d 456, 469-70 (2d Cir.), <u>cert. denied</u>, 534 U.S. 993, 122 S. Ct. 460 (2001); <u>James</u> v. <u>N.Y. Racing Ass'n</u>, 233 F.3d 149, 156-57 (2d Cir. 2000); <u>Weinstock</u> v. <u>Columbia Univ.</u>, 224 F.3d at 42 ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."); <u>Aksamit</u> v. <u>772 Park Ave. Corp.</u>, 00 Civ. 5520, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2, 2003) ("[A] plaintiff's establishment of a prima facie case and rebuttal of a nondiscriminatory reason for the adverse action do not save the plaintiff from summary judgment when there is insufficient evidence of discrimination."), <u>aff'd</u>, 128 Fed. Appx. 204 (2d Cir. 2005); <u>Weiser</u> v. <u>Forest Pharm., Inc.</u>, 99 Civ. 1809, 2001 WL 293951 at *7-8 (S.D.N.Y. Mar. 26, 2001); <u>Tanay</u> v. <u>Saint Barnabas Hosp.</u>, 99 Civ. 9215, 2001 WL 262695 at *4 (S.D.N.Y. Mar. 15, 2001); <u>Connell</u> v. <u>Consol. Edison Co.</u>, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000) (Chin, D.J.) ("The key is whether there is sufficient evidence in the record – whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence – to support an inference of discrimination.").

## V.    DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT WITH RESPECT TO SICULAR'S RACE, RELIGION AND AGE DISCRIMINATION CLAIMS

### A.    Sicular's Allegations Fail to Establish a Prima Facie Case of Discrimination

It is well settled that a plaintiff asserting a claim under Title VII must first establish a prima facie case of discrimination.  (See cases cited at pages 32-34 above.)  A Title VII plaintiff meets that burden by showing that:  (1) he was within a protected group, (2) he was qualified for the functions of his position, (3) he suffered an adverse employment action, and (4) that the action took place under circumstances giving rise to an inference of discrimination.  See, e.g., Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009); Crawford v. Dep't of Investigation, 324 Fed. Appx. 139, 141 (2d Cir. 2009); Danzy v. Chao, 177 Fed. Appx. 133, 134 (2d Cir. 2006); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001); Hollander v. Am. Cynamid Co., 172 F.3d 192, 199 (2d Cir.), cert. denied, 528 U.S. 965, 120 S. Ct. 399 (1999).

For purposes of this motion, defendants have conceded that under this Circuit's jurisprudence, Sicular would be deemed to satisfy the first three prongs of the McDonnell Douglas analysis for his discriminatory termination claims.[24/]  (Dkt. No. 28: Defs. Br. at 10.)  However, Sicular fails to establish that his termination took place under circumstances giving rise to an inference of discrimination.

---

[24/]    Other than his termination, Sicular did not suffer any adverse employment action.  His hostile environment claim will be analyzed in Point V.C below.

1.     <u>**Race**</u>

Sicular does not point to any race-based comments by defendants David, Rodriguez

or Ramos (or by anyone else at DHS).  Rather, he attempts to show that he was terminated because

he is Caucasian by showing that African American probationary DHS employees who had worse

attendance problems were not terminated.  (<u>See</u> page 16 above.)  Sicular points to the fact that other

probationary PATH Fraud Investigators during the time he was employed by DHS had worse time

and leave records: Marjorie Smith, Robin Dickerson and Jennifer Baker.  (<u>See</u> page 16 above.)

Absent direct evidence of a defendant's discriminatory intent, a plaintiff may establish

the fourth prong of the prima facie case, circumstances giving rise to an inference of discrimination,

by showing that he was treated differently than similarly situated employees outside his protected

group.  <u>See</u>, <u>e.g.</u>, <u>Berube</u> v. <u>Great Atl. & Pac. Tea Co.</u>, No. 08-1229-CV, 2009 WL 3316381 at *2

(2d Cir. Oct. 15, 2009); <u>Mandell</u> v. <u>County of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003); <u>Graham</u>

v. <u>Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000); <u>Shumway</u> v. <u>UPS, Inc.</u>, 118 F.3d 60, 64 (2d Cir.

1997); <u>Conway</u> v. <u>Microsoft</u>, 414 F. Supp. 2d 450, 459 (S.D.N.Y. 2006).  In order to prove that he

was subjected to disparate treatment, a plaintiff must show that he was "'similarly situated in all

material respects' to the individuals with whom [he] seeks to compare [himself]."   <u>Conway</u> v.

<u>Microsoft</u>, 414 F. Supp. 2d at 459; <u>accord</u>, <u>e.g.</u>, <u>Berube</u> v. <u>Great Atl. & Pac. Tea Co.</u>, 2009 WL

3316381 at *2; <u>Mandell</u> v. <u>County of Suffolk</u>, 316 F.3d at 379; <u>McGuinness</u> v. <u>Lincoln Hall</u>, 263

F.3d 49, 53-54 (2d Cir. 2001); <u>Graham</u> v. <u>Long Island R.R.</u>, 230 F.3d at 39; <u>Shumway</u> v. <u>UPS, Inc.</u>,

118 F.3d at 64.  "What constitutes 'all material respects' . . . varies somewhat from case to case

and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Graham v. Long Island R.R., 230 F.3d at 40 ("Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases. . . ."); see also, e.g., Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 260 (E.D.N.Y. 2005) ("'Similarly situated' means the other employee 'must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.'").

Sicular has failed to establish that Marjorie Smith, Robin Dickerson and Jennifer Baker were similarly situated in all material respects.  Sicular only refers to these three DHS employees with respect to their time and leave records.  (See page 16 above.)  The record is clear, however, that Sicular was not terminated merely because of his numerous instances of lateness:  By the time defendant Carol David received a request for disciplinary action from Yvette Gonzalez on May 31, 2006, Sicular had already been counseled on two occasions, had become the subject of an internal Equal Opportunity Affairs Office investigation because of a statement he made regarding foreign drivers, was the subject of a complaint memo from defendant Ramos because of a statement he made regarding non-citizens, and had been the subject of two memos from supervisors because of his inappropriate behavior.  (See pages 2-8 above.)  There is no evidence that the three alleged comparators engaged in any similar conduct.  (See page 16 above.)  Moreover, Sicular has admitted

to his lateness, to his comments regarding foreigners, and to most of the other misconduct.  (See pages 3, 5, 7, 8 above.)

Since Sicular has failed to prove that any of these three DHS employees engaged in similarly-serious inappropriate behavior, these employees are not similarly situated in all material respects.[25/]  E.g., Conway v. Microsoft, 414 F. Supp. 2d at 464 ("When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment."); see, e.g., Bengard v. United Parcel Serv., 48 Fed. Appx. 350, 352 (2d Cir. 2002) (summary judgment affirmed for employer because terminated employee who "falsified his time sheets to reflect that he was working on company tasks when he was in fact repairing private vehicles" was not similarly situated to employee who fixed private vehicles on his own time); Cruz v. Coach Stores, Inc., 202 F.3d 560, 567-68 (2d Cir. 2000) (summary judgment affirmed for employer because terminated employee who engaged in physical fight was not similarly situated to employee who only used racial slurs.).[26/]

---

[25/]      Additionally, these comparators are not similarly situated to Sicular because defendant Ramos did not supervise their time and leave.  (See page 16 n.5 above.)  "In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated."  Conway v. Microsoft, 414 F. Supp. 2d at 465. The fact that defendant Ramos did not supervise Smith or Dickerson, and possibly Jennifer Baker, is important, because defendant Ramos testified that he supervised Sicular's time and leave records, and because it was defendant Ramos who counseled Sicular on his numerous instances of lateness.  (See pages 5-6, 8, 16 n.5 above.)

[26/]      See also, e.g., McKinney v. Bennet, 06 Civ. 13486, 2009 WL 2981922 at *7 (S.D.N.Y. Sept. 16, 2009) (summary judgment for employer granted because State trooper with a lengthy disciplinary history who placed a female trooper's hand on his penis was not "similarly
(continued...)

Because Sicular offers no direct evidence that he was terminated because of his race, and because his alleged comparators are not similarly situated in all material respects, he has failed to establish a prima facie case of racial discrimination.

### 2.   Religion

Sicular's religious discrimination claim is even weaker than his race discrimination claim.  Indeed, at his deposition he could only say that he "possibly" was discriminated against based on his religion.  (See page 16 above.)  While Sicular testified to anti-Semitic remarks by co-workers, he did not identify any anti-Semitic remarks by the individual defendants or any other supervisors.  (See page 17 above.)  Sicular's personal belief – which even he admitted was "speculation" (see page 17 above) – that his being Jewish played into the prejudices of the individual defendants and reinforced their animosity against him is insufficient to defeat defendants' summary judgment motion.  See, e.g., Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."), cert. denied, 484 U.S. 829, 106

---

26/   (...continued)
situated to either his female victims or the white troopers he attempt[ed] to compare himself to" because they had not behaved in a similar manner and did not have similar disciplinary histories); Gonzalez v. N.Y.C. Transit Auth., 00 Civ. 4293, 2001 WL 492448 at *15 (S.D.N.Y. May 9, 2001) (Peck, M.J.) ("An employee who agrees to settle misconduct charges is not similarly situated to one who contests the charges and is found guilty at an administrative hearing."); Economou v. Caldera 99 Civ. 12117, 2000 WL 1844773 at *29 (S.D.N.Y. Dec. 18, 2000) (Peck, M.J.) ("In the absence of evidence that employees who engaged in conduct similar to [Plaintiff]'s - i.e., submitting apparently fraudulent travel vouchers-were not investigated, the fact that other employees were not being investigated for fraud is irrelevant.").

S. Ct. 91 (1985); see also, e.g., Baptiste v. Cushman & Wakefield, 03 Civ. 2102, 2007 WL 747796 at *7 (S.D.N.Y. Mar. 7, 2007) ("Plaintiff's mere subjective belief she was discriminated against because of her race . . . cannot sustain a charge of race discrimination."); Patterson v. Newspaper & Mail Deliverers' Union, 73 Civ. 4278, 2005 WL 3750749 at *16 (S.D.N.Y. July 13, 2005) ("A party's own self-serving conclusory statements cannot sustain a Title VII claim of discrimination."); Dean v. Westchester County Dist. Attorney's Office, 119 F. Supp. 2d 424, 430 (S.D.N.Y. 2000) ("[T]he mere fact that [plaintiff] believed white, male employees similarly situated were not disciplined for similar professional failures is not a sufficient basis to infer discrimination.").

Sicular does not offer any comparators for his claim of religious discrimination, as he did for his race discrimination claim. Instead, he points to anit-Semitic remarks – such as to "Jewed you down" meaning to get a lower price – by co-workers approximately once every four weeks. (See pages 16-17 above.) Sicular concedes that he felt the remarks were not malicious, he responded by making jokes, and the remarks did not affect his work environment. (See pages 16-17 above.)[27] Consequently, Sicular's own testimony establishes that these stray remarks did not rise to

_____

[27] These few instances of alleged anti-Semitic comments were not directed to Sicular, further weakening the probative value. See, e.g., Renz v. Grey Adver., Inc., 135 F.3d 217, 224 (2d Cir. 1997) (Granting summary judgment to employer because plaintiff's sole evidence of discrimination consisted of isolated remarks by decision-maker that, although inappropriate, were not directed at plaintiff.); Velez v. SES Operating Corp., 07 Civ. 10946, 2009 WL 3817461 at *11 (S.D.N.Y. Nov. 12, 2009) ("[T]he [inappropriate] comment made by [defendant] to an unknown person on the telephone - a comment overheard by plaintiff . . . while standing outside her office - is best characterized as a 'stray remark' that is not probative of a discriminatory motive."); Nugent v. St. Luke's / Roosevelt Hosp. Ctr., 05 Civ. 5109, 2007 WL 1149979 at *16 (S.D.N.Y. Apr. 18, 2007) (inappropriate gender related remarks made by male supervisor but not directed at female plaintiff were "insufficient to
(continued...)

the level of actionable conduct, especially since they were not made by the decision-makers who fired him.  See, e.g., Tomassi v. Insignia Fin. Group, Inc.,  478 F.3d 111, 115 (2d Cir. 2007) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."); Gueye v. Evans, 04 Civ. 6029, 2006 WL 3298427 at *4 (S.D.N.Y. Nov. 13, 2006) ("As an initial matter, that a co-worker who was not in a supervisory relationship vis-à-vis [plaintiff] and had no role in firing him referred to him as a 'vendejo' does not suggest that his demotion and termination were made with discriminatory intent."), aff'd, 277 Fed. Appx. 70 (2d Cir.), cert. denied, 129 S. Ct. 178 (2008).[28/]

---

[27/]  (...continued)
demonstrate that the adverse actions taken against the plaintiff [were] attributable to gender bias"), aff'd, 303 Fed. Appx. 943 (2d Cir. 2008); Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 279 (S.D.N.Y. 2007) ("In addition, it is undisputed that the . . . comments were not directed at plaintiff."); Green v. Harris Publ'ns, Inc., 331 F. Supp. 2d 180, 192 (S.D.N.Y. 2004) (Granting summary judgment to defendant on plaintiff's hostile work environment claim, where two racially discriminatory comments overheard by plaintiff and not directed to plaintiff were isolated stray remarks.).

[28/]  See also, e.g., Opoku-Acheampong v. Depository Trust Co., 99 Civ. 0774, 2005 WL 1902847 at *3 (S.D.N.Y. Aug. 9, 2005) ("[S]tray comments are not evidence of discrimination if they are not temporally linked to an adverse employment action or if they are made by individuals without decision-making authority."); Belardo v. Con-Way Transp. Servs., No. 02CV5406, 2005 WL 885016 at *4 (E.D.N.Y Mar. 28, 2005) (plaintiff's perception of comments as discriminatory, made by individuals with no decision making authority, "are thus the sort of stray remarks made by non-decision makers that have been held insufficient by themselves to raise an inference of discrimination."); Monte v. Ernst & Young, LLP, 330 F. Supp. 2d 350, 363 (S.D.N.Y. 2004) ("Plaintiff's evidence of stray comments [by a non-decision maker] and [that person's] biases would be insufficient, without more, to demonstrate that discrimination was a determinative factor in the [termination] decision."), aff'd, 148 Fed. Appx. 43 (2d Cir. 2005).

In short, as Sicular himself conceded, his religious discrimination claim "is all speculation that [he] can't prove or substantiate."  (<u>See</u> page 17 above.)  He has failed to establish a prima facie case of religious discrimination.

### 3.    <u>Age</u>

A plaintiff asserting a claim under the ADEA must first establish a prima facie case of discrimination.  (<u>See</u> cases cited at pages 32-34 above.)  However, there is one important diference under the ADEA.  "To establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  <u>Gross</u> v. <u>FBL Servs.</u>, 129 S. Ct. 2343, 2350 (2009); <u>accord</u>, <u>e.g.</u>, <u>Leibowitz</u> v. <u>Cornell Univ.</u>, 584 F.3d 487, 498 n.2 (2d Cir. 2009).

Sicular does not assert that DHS, the individual supervisor defendants, or for that matter anyone else at DHS, made any ageist comments; rather, Sicular merely claimed that he was one of the few Fraud Investigators over 60 years of age.  (<u>See</u> page 18 above.)  He gives no specifics or statistics.  The CCHR found, however, that thirteen of the 133 Fraud Investigators were fifty-nine years old and over.  (<u>See</u> page 14 above.)  <u>See</u>, <u>e.g.</u>, <u>Carr</u> v. <u>Westlb Admin., Inc.</u>, 171 F. Supp. 2d 302, 308 (S.D.N.Y. 2001) (dismissing age discrimination claim where "almost half of plaintiff's former coworkers [were] over forty years of age (the ADEA's protected class) and that plaintiff was younger than at least two other employees in his department (and only one year older than a third).").  More importantly, Sicular admitted that he "can't give you a real specific thing [about age bias], except to say that [he] wasn't given much respect."  (<u>See</u> page 18 above.)  Again, his perception or

belief is not evidence.  (See cases cited at pages 43-44 above.)  Furthermore, Sicular testified that

he believed age "might have been a contributing factor" because we live in a "youth culture."  (See

page 18 above.)  Even if Sicular had any evidence to support this supposition, it would not be enough

– the Supreme Court requires age to be the "but for" cause of his termination, and there is no

evidence that it was such.  See, e.g., Wellesley v. Debevoise & Plimpton LLP, No. 08-1360-CV,

2009 WL 3004102 at *1 (2d Cir. Sept. 21, 2009) ("Plaintiff provided no evidence to support her

conclusory assertions that Defendants' explanations were pretextual. Consistent with that conclusion,

the record lacks evidence from which a fact finder could conclude that age-related animus was the

"but-for" cause of Plaintiff's termination."); Nieves v. Angelo, Gordon & Co., 341 Fed. Appx. 676,

678 (2d Cir. 2009) ("A plaintiff cannot defeat a summary judgment motion based on 'purely

conclusory allegations of [age] discrimination, absent any concrete particulars.'"); Mauskopf v. Dist.

20 of N.Y.C. Dep't of Ed., 299 Fed. Appx. 100, 101 (2d Cir. 2008) ("Plaintiff's inability to respond

with evidence suggesting that age was a factor in her discharge is adequate grounds for summary

judgment in favor of defendants."); Heuser v. Metro. Transit Auth., No. 98-7810, 173 F.3d 844

(table), 1999 WL 220144 at *1 (2d Cir. Apr. 13, 1999) ("The plaintiff's burden to establish a prima

facie case of age discrimination is minimal, but speculative, conclusory allegations will not suffice

to withstand a motion for summary judgment.").

        Sicular's age bias discrimination claim should be dismissed.

**B.      Defendants Articulated Legitimate, Non-Discriminatory Reasons for Their Termination of Sicular, and Sicular Has Not Shown That These Reasons Are False or Pretextual**

Sicular was terminated because of lateness, insubordination and inappropriate comments regarding national origin.  (See pages 2-11 above.)  Sicular admitted to each instance of lateness for which he was counseled.  (See pages 5, 8 above.)  Sicular admitted to making an inappropriate comment regarding foreign drivers within the first six weeks of his probationary employment with DHS.  (See pages 3, 7, 10 above.)  Sicular admitted to distributing an article with inappropriate personal comments.  (See page 6 above.)[29]  While Sicular disputes some of the supervisors' claims of insubordination (see pages 17-18 above), that does not create a material issue of fact.  DHS had sufficient grounds to terminate Sicular because of the conduct he has admitted to – the lateness and the inappropriate comments about foreigners and immigrants.  As a result of Sicular's lateness and inappropriate comments, defendant David recommended plaintiff's termination.  (See pages 8, 10-11 above.)

Thus, defendants have met their burden at the second stage of McDonnell Douglas of articulating a legitimate, non-discriminatory reason for terminating Sicular's probationary employment.  See, e.g., Wellesley v. Debevoise & Plimpton LLP, No. 08-1360-CV, 2009 WL 3004102 at *1 (2d Cir. Sept. 21, 2009) (Defendants' explanations were not pretextual when supported by Plaintiff's admission "that she was often tardy to work, and evidence that she fell asleep at her desk while at the office.");  Dorfman v. Doar Commc'ns Inc., 314 Fed. Appx. 389, 391 (2d Cir.

---

[29]      In addition, three PATH supervisors – defendant Ramos, defendant Rodriguez, and Donaldson Barclary – complained about Sicular's behavior.  (See pages 3-9 above.)

2009) (affirming summary judgment where "evidence of [plaintiff's] unsatisfactory work performance constituted a legitimate nondiscriminatory reason for [plaintiff's] termination, one that [plaintiff] failed to undermine as illegitimate or pretextual."); Mauskopf v. Dist. 20 of N.Y.C. Dep't of Ed., 299 Fed. Appx. 100, 101 (2d Cir. 2008) (evidence, including "written complaints by students and other teachers alleging verbal abuse and corporal punishment by plaintiff from the 1996-97 school year, and an unsatisfactory rating on plaintiff's annual review for that year" were sufficient to demonstrate that teacher's discharge was not pretextual.).[30]

       Thus, even if Sicular had proved a prima facie case of discrimination (which he has not), he would have to show, at the third McDonnell Douglas stage, that the adverse employment action was more likely than not motivated by discriminatory reasons (or, in the case of age, that age discrimination was a "but for" cause of his termination). (See cases cited at pages 35-36, 46 above.)

       As described above in connection with Sicular's prima facie case, he either has not made out a prima facie case (which this Court has so held) or if he has, it is an incredibly weak showing. While Sicular challenges some of defendants' claims of his insubordination (see pages 17-

---

[30]   See also, e.g., Baur v. Rosenberg, Minc, Falkoff & Wolff, 07 Civ. 8835, 2008 WL 5110976 at *5 (S.D.N.Y. Dec. 2, 2008) (dismissing age discrimination claim where plaintiff "effectively concede[d] a pattern of repeated conflict with supervisors, fellow employees, and outsiders that would warrant a reasonable employer in concluding that [plaintiff]'s services were expendable"); Hamilton v. Mount Sinai Hosp. 528 F. Supp. 2d 431, 441-42 (S.D.N.Y.2007) (dismissing age discrimination claim where plaintiff admitted violating hospital's time card policy but argued that "having other employees swipe one's time card was 'commonplace'" at the hospital.), aff'd, 331 Fed. Appx. 874 (2d Cir. 2009); Vasquez v. Pathways for Youth, 04 Civ. 9970, 2006 WL 464042 at *6 (S.D.N.Y. Feb. 23, 2006) (dismissing gender discrimination claim where plaintiff admitted that "she engaged in unprofessional conduct and insubordination, as charged in the termination memorandum.") (Chin, D.J.).

18 above), he concedes that the factual basis for the main reasons DHS gave for firing him – his lateness and his improper comments about immigrants and foreigners – are true.  (See pages 3, 5, 7-8, 10 above.)  Accordingly, at the third McDonnell Douglas step, the case for granting summary judgment to defendants is even stronger than at the prima facie case stage.

Accordingly, the Court should grant summary judgment to defendants dismissing Sicular's claims that he was terminated because of his race, religion and/or age.

**C.    Defendants' Summary Judgment Motion Should be Granted with Respect to Sicular's Hostile Work Environment Claims**

To establish a hostile work environment claim, Sicular must show that defendants' conduct was:

> "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986)) (internal brackets and quotation marks omitted). The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace.  See Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).  All of the circumstances must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it.  See Harris v. Forklift Sys., 510 U.S. 17, 21-23, 114 S. Ct. 367, 370-71 (1993); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).

Gallagher v. Delaney, 139 F.3d 338, 346-47 (2d Cir. 1998), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); accord, e.g., Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009); Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d

73, 82 (2d Cir. 2009); Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007); Feingold v. New York, 366

F.3d 138, 149-50 (2d Cir. 2004).[31/]

    "Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an

objectively hostile or abusive work environment'" is insufficient to establish a Title VII

discrimination claim. Torres v. Pisano, 116 F.3d at 631; accord, e.g., Duch v. Jakubek, 588 F.3d

at 762; Rios v. Buffalo & Fort Erie Pub. Bridge Auth., 326 Fed. Appx. 612, 613-14 (2d Cir. 2009);

DeSalvo v. Volhard, 312 Fed. Appx. 394, 397 (2d Cir.), cert. denied, 130 S. Ct. 70 (2009); Slaitane

v. Sbarro, Inc., 2004 WL 1202315 at *13; Williams v. NYC Dep't of Sanitation, 2001 WL 1154627

at *13; see also, e.g., Dayes v. Pace Univ., 2 Fed. Appx. at 207 (Defendant's "comments and

behavior, although boorish and inappropriate, simply do not rise to the level of behavior necessary

for a jury reasonably to conclude that they were sufficiently severe or pervasive to alter the condition

of [plaintiff]'s employment."). "Thus, harms suffered in the workplace are cognizable under Title

---

[31/]    See also, e.g., Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004); Terry v.
Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003); Alfano v. Costello, 294 F.3d 365, 373-74 (2d
Cir. 2002); Dayes v. Pace Univ., 2 Fed. Appx. 204, 207 (2d Cir. 2001); Whidbee v.
Garzarelli Food Specialties, Inc., 223 F. 3d 62, 69-71 (2d Cir. 2000); Howley v. Town of
Stratford, 217 F.3d 141, 153-54 (2d Cir. 2000); Richardson v. New York State Dep't of Corr.
Serv., 180 F.3d 426, 437-40 (2d Cir. 1999), abrogated on other grounds by Burlington Indus.,
Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); Torres v. Pisano, 116 F.3d 625, 630
(2d Cir.), cert. denied, 522 U.S. 997, 118 S. Ct. 563 (1997); Cosgrove v. Sears, Roebuck &
Co., 9 F.3d 1033, 1042 (2d Cir. 1993); Slaitane v. Sbarro, Inc., 03 Civ. 5503-04, 2004 WL
1202315 at *12-13 (S.D.N.Y. June 2, 2004) (Peck, M.J.); Viruet v. Citizen Advice Bureau,
01 Civ. 4594, 2002 WL 1880731 at *15 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.); Williams
v. NYC Dep't of Sanitation, 00 Civ. 7371, 2001 WL 1154627 at *12-13 (S.D.N.Y. Sept. 28,
2001) (Peck, M.J.); Adeniji v. Admin. for Children Servs., 43 F. Supp. 2d 407, 421
(S.D.N.Y.) (Wood, D.J. & Peck M.J.), aff'd, No. 99-7561, 201 F.3d 430 (table), 1999 WL
1070027 (2d Cir. Nov. 18, 1999).

VII, even when they are not the result of 'tangible employment actions,' if they arise from conduct (1) that is 'objectively' severe or pervasive – that is, if it creates 'an environment that a reasonable person would find hostile or abusive' [the 'objective' requirement], (2) that the plaintiff 'subjectively perceive[s]' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex (or other characteristic protected by Title VII) [the 'prohibited causal factor' requirement]."  <u>Gregory</u> v. <u>Daly</u>, 243 F.3d 687, 691-92 (2d Cir. 2001) (citations omitted, bracketed material in original).

Isolated incidents of discriminatory comments or conduct is not sufficient to establish a hostile work environment.  <u>E.g.</u>, <u>Faragher</u> v. <u>City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998) ("'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); <u>Harris</u> v. <u>Forklift Sys., Inc.</u>, 510 U.S. at 21, 114 S. Ct. at 370 ("'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII"); <u>Demoret</u> v. <u>Zegarelli</u>,  451 F.3d 140, 149 (2d Cir. 2006) ("Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' Generally, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'") (citations omitted); <u>Petrosino</u> v. <u>Bell Atlantic</u>, 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive

conduct (unless extremely serious) will not support a claim of discriminatory harassment.").[32] "Among the factors [the courts] consider are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes in [the] employee's work performance.'" Feingold v. New York, 366 F.3d at 150 (quoting Harris v. Forklift Sys., Inc., 510 U.S. at 23, 114 S. Ct. at 371).[33]

Sicular claims that defendants created a hostile work environment through his four counseling sessions, his supervisors "ignoring" him, his Nextel "mysteriously" disappearing and that fact that he was terminated.  (See pages 17-18 above.)  Sicular also alleges that he was "verbally

---

[32]  See also, e.g., Byrne v. Telesector Res. Group, Inc., 339 Fed. Appx. 13, 18 (2d. Cir. 2009) (isolated incidents of offensive misconduct "do not rise to a sufficiently serious level to manifest a work environment 'permeated with discriminatory intimidation.'"); DeSalvo v. Volhard, 312 Fed. Appx. at 397; Feingold v. New York, 366 F.3d at 150 ("'As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."'"); Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001) ("'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"); Rizzo-Puccio v. College Auxiliary Servs., Inc., No. 99-9272, 216 F.3d 1073 (table), 2000 WL 777955 at *3 (2d Cir. June 14, 2000) ("[I]solated remarks or occasional episodes of harassment do not constitute a hostile environment within the meaning of Title VII."); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) ("As a general matter, 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.'"), abrogated on other grounds by, National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002); Slaitane v. Sbarro, Inc., 2004 WL 1202315 at *13; Diaz v. Weill Med. Ctr. of Cornell Univ., 02 Civ. 7380, 2004 WL 285947 at *18 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.) (& cases cited therein), aff'd, 138 Fed. Appx. 362 (2d Cir. 2005).

[33]  Accord, e.g., Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d at 82; Patane v. Clark, 508 F.3d at 113; Demoret v. Zegarelli,  451 F.3d at 149-50; Mormol v. Costco Wholesale Corp., 364 F.3d at 58; Terry v. Ashcroft, 336 F.3d at 148; Slaitane v. Sbarro, Inc., 2004 WL 1202315 at *13.

abused" by defendants Ramos and Rodriguez.  (See page 18 above.)  Sicular alleged that defendant Rodriguez verbally abused him by saying "get up, get out" to him at the beginning of one of his shifts, and that she told him to not come into his office.  (See page 18 above.)  Sicular believes that defendant Ramos once implied that he was a member of the Ku Klux Klan, and based this belief on defendant Ramos asking him if he left his "cape at the door."  (See page 18 above.)

Even when viewing the totality of the alleged conduct Sicular complains of, Sicular's allegations fail to rise to the level of a hostile work environment.  Importantly, Sicular fails to allege how the conduct he complains of interfered with his ability to do his work.  See Murray v. Visiting Nurse Servs. of N. Y., 528 F. Supp. 2d 257, 278 (S.D.N.Y. 2007) (plaintiff failed to successfully plead that he was subjected to a hostile work environment because he conceded that the conduct at issue did not "'adversely affect the terms and conditions of his own employment.'").

Additionally, Sicular points to the two instances discussed above as the only times during his almost seven months of employment with defendant DHS in which he felt he was "verbally abused."  However, even if this Court should credit these two remarks as offensive, they are insufficient to successfully show actionable discrimination because "'isolated instances of harassment ordinarily do not rise to [the] level'" of a hostile work environment.  Murray v. Visiting Nurse Servs. of N. Y., 528 F. Supp. 2d at 277; see also, e.g., Brennan v. Met. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999) ("Isolated, minor acts or occasional episodes do not warrant relief."); Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999) ("In order to meet his burden, the plaintiff must show 'more than a few isolated incidents'" and that "evidence solely of 'sporadic'"

discriminatory conduct does not suffice.).  As such, these two isolated remarks fail to rise to the level of actionable conduct by defendants.

Sicular further complains that his supervisors did not say hello to him, but he fails to allege that his supervisors did not greet him as a result of his "protected class."  Importantly, it is well settled that Title VII is not a general civility code.  Williams v. City of New York, 04 Civ. 1993, 2005 WL 839103 at *10 (S.D.N.Y. April 14, 2005) (Peck, M.J.) ("A supervisor's 'dislike' of an employee . . . does not violate Title VII.") (citing cases); see, e.g., Faragher v. City of Boca Raton, 524 U.S. at 788, 118 S. Ct. at 2283-84 ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'").  Thus, Sicular's claims that he was subject to a hostile work environment because his supervisors did not like him or did not address him in a cordial manner, fail as a matter of law.  See, e.g., Stofsky v. Pawling Cent. Sch. Dist., 635 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("At most, all Plaintiff has established is that District administrators were not the most nurturing supervisors.  But the law does not require civility; it only requires that employers not manifest discriminatory animus in their supervision of employees." (citations omitted)).

Moreover, defendants benefit from the so-called Faragher/Ellerth defense given that Sicular unreasonably failed to take advantage of any preventative or corrective opportunities provided by DHS.  See Stofsky v. Pawling Cent. Sch. Dist., 635 F. Supp. 2d at 294-95.  Sicular fails to allege that he made any complaint, internally or externally, regarding the alleged anti-Semitic statements.  (See pages 11-12, 16-17 above.)  Additionally, after making an internal complaint to the

DHS Office of Equal Opportunity Affairs regarding defendant Rodriguez, Sicular withdrew his complaint.  (See pages 11-12 above.)

## VI.    DEFENDANTS' SUMMARY JUDGMENT MOTION SHOULD BE GRANTED AS TO SICULAR'S RETALIATION CLAIM

Under Title VII and the ADEA, it is unlawful for an employer to "retaliate" by discriminating against an employee because the employee engaged in protected activity, that is, "has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); 29 U.S.C.S. 623(d).[34]

"To succeed on a claim of retaliation, a plaintiff must show that 1) the employee engaged in a protected activity; 2) the employer was aware of that activity; 3) the employee suffered an adverse employment action; and 4) there was a causal connection between the protected activity and the adverse employment action." Blanco v. Brogan, 620 F. Supp. 2d 546, 553 (S.D.N.Y. 2009);

---

[34]    See, e.g., Sengillo v. Valeo Elec. Sys., Inc., 328 Fed. Appx. 39, 40-41 (2d Cir. 2009); Crawford v. Metro. Gov't of Nashville & Davidson County, 129 S. Ct. 846, 850 (2009); Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 120-21 (2d Cir. 2008), cert. denied, 130 S. Ct. 56 (2009); Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 241 (2d Cir. 2007); Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006); Terry v. Ashcroft, 336 F.3d 128, 140 (2d Cir. 2003); Diaz v. Weill Med. Ctr. of Cornell Univ., 02 Civ. 7830, 2004 WL 285947 at *21 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.), aff'd, 138 Fed. Appx. 362 (2d Cir. 2005); Minott v. Port Auth., 116 F. Supp. 2d 513, 520, 524 (S.D.N.Y. 2000) ("Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding."); see also Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) ("The objective of [the section prohibiting retaliation] is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice.").

accord, e.g., Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d at 205-06; Treglia v.

Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Weixel v. Bd. of Educ., 287 F.3d 138, 148-49

(2d Cir. 2002); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001);

Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000); Munck v. New Haven Sav. Bank,

251 F. Supp. 2d 1078, 1085 (D. Conn. 2003).

> The Supreme Court recently explained:

> The term "oppose," being left undefined by the statute, carries its ordinary meaning: "to resist or antagonize . . . ; to contend against; to confront; resist; withstand," Webster's New International Dictionary 1710 (2d ed.1958). Although these actions entail varying expenditures of energy, "RESIST frequently implies more active striving than OPPOSE." Ibid.; see also Random House Dictionary of the English Language 1359 (2d ed.1987) (defining "oppose" as "to be hostile or adverse to, as in opinion").

Crawford v. Metro. Gov't of Nashville & Davidson County, 129 S. Ct. at 850. "When an employee

communicates to his or her employer a belief that the employer has engaged in unlawful

discrimination, that conduct 'virtually always' constitutes conduct for which the employee is entitled

to protection under Title VII." Nyeneime Ibok v. Sec. Indus. Automation Corp., 05 Civ. 6584, 2009

WL 855926 at *8 (S.D.N.Y. Mar. 26, 2009) (paraphrasing Crawford v. Metro. Gov't). For example,

an employee may "oppose" the employer's practice by informally complaining to management or,

as Crawford recently held, speaking out about discrimination in response to questions rather than on

the employee's own initiative. Crawford v. Metro. Gov't of Nashville & Davidson County, 129 S.

Ct. at 851 ("There is, then, no reason to doubt that a person can 'oppose' by responding to someone

else's question just as surely as by provoking the discussion, and nothing in the statute requires a

freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.")[35]

      Sicular complains that defendants retaliated against him and terminated him for an internal complaint of discrimination involving defendant Rodriguez, which he mailed to defendant David on May 1, 2006.  (See pages 11-12 above.)

      Here, defendants have conceded, for purposes of this motion, that by filing an internal complaint with the DHS Equal Opportunity Affairs Office, Sicular engaged in protected activity.  (See Dkt. No. 28:  Defs. Br. at 22.)  Nevertheless, Sicular cannot make out a prima facie case of retaliation because he cannot establish a causal connection between his internal complaint of discrimination and his termination.  Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees.  See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 224; DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965, 108 S. Ct. 455 (1987).

---

[35]    See, e.g., Weiss v. Hustedt Chevrolet, No. 05-CV-4230, 2009 WL 2132444 at *13 (E.D.N.Y. July 13, 2009) ("[P]rotest[ing] or oppos[ing] statutorily prohibited discrimination . . . includes, for example 'informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'") (citations omitted, quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)).

The cases that accept mere temporal proximity between an employer's knowledge or protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 1511 (2001) (periods of three and four months between protected activity and adverse employment's action insufficient to establish causal connection).  As the Second Circuit has observed, there is no "bright line rule" that defines "the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001).  Most of the decisions in this Circuit that have addressed this issue have held that lapses of time shorter than even three months are insufficient to support an inference of causation.  See, e.g., Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (passage of two and a half months too long to establish retaliation for an EEOC complaint); Meggison v. Paychex, Inc., --- F. Supp. 2d ---, 2010 WL 117716 at *8 (W.D.N.Y. Jan. 8, 2010) ("[T]hree months and twenty-four days [] is insufficiently temporally proximate to infer that [plaintiff's] termination was a result of his having taken FMLA qualifying leave."); Garrett v. Garden City Hotel, Inc., No. 05-CV-0962, 2007 WL 1174891 at *20-21 (E.D.N.Y. Apr. 19, 2007) (Two and one-half months in between plaintiff's "most recent complaint of racial discrimination" and her discharge "preclude[d] a finding of a causal connection between the protected activity and the adverse employment action."); Ruhling v. Tribune Co., No. CV-04-2430, 2007 WL 28283 at *23 (E.D.N.Y. Jan. 3, 2007) ("district courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse

employment action seems to be the dividing line") (citing cases); <u>Cunningham</u> v. <u>Consol. Edison</u>

<u>Inc.</u>, No. CV-03-3522, 2006 WL 842914 at *19-20 (E.D.N.Y. Mar. 28, 2006) (a "lag of three, four,

and fourteen months is too long for a causal inference to be appropriate"; the "passage of two months

between the protected activity and the adverse employment action seems to be the dividing line").<u>36/</u>

       Here, Sicular sent an internal complain of discrimination to defendant David, through

the mail, on May 1, 2006.  (<u>See</u> page 11 above.)  Defendant David did not recommend Sicular's

termination until August 10, 2006, over three months after his alleged protected activity.  (<u>See</u> page

10 above.)  Further, the evidence before the Court establishes that, by the time Sicular mailed his

internal complaint of discrimination to defendant David, Sicular had already been counseled by

defendant's Ramos and Rodriguez, had been warned regarding superfluous comments on his field

investigation questionnaires and had been the subject of an internal complaint of discrimination.

(<u>See</u> pages 2-10 above.)

       Courts in this Circuit have consistently held that "[w]here timing is the only basis for

a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever

engaged in any protected activity, an inference of retaliation does not arise."  <u>Slattery</u> v. <u>Swiss</u>

<u>Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir.), <u>cert. denied</u>, 534 U.S. 951, 122 S. Ct. 348 (2001);

<u>see also</u>, <u>e.g.</u>, <u>Stroud</u> v. <u>N.Y.C.</u>, 374 F. Supp. 2d 341, 352 (S.D.N.Y. 2005); <u>Hunter</u> v. <u>St. Francis</u>

---

36/    See also, <u>e.g.</u>, <u>Wayne</u> v. <u>Principi</u>, 01 Civ. 941, 2004 WL 389009 at *13 (S.D.N.Y. Mar. 3, 2004) (three month period between protected activity and adverse act was not enough to establish a causal connection); <u>Carr</u> v. <u>WestLB Administration, Inc.</u>, 171 F. Supp. 2d 302, 310 (S.D.N.Y. 2001) (four month lapse of time insufficient); <u>Cobian</u> v. <u>New York City</u>, 99 Civ. 10533, 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (Peck, M.J.) (four-month gap is insufficient evidence of a causal connection).

Hosp., 281 F. Supp. 2d 534, 547 (E.D.N.Y. 2003).  It is clear from Sicular's short history with DHS, that by May 1, 2006 Sicular had already begun to receive verbal warnings and been subject to counseling sessions because of his inappropriate behavior, his lateness and his misconduct.  In fact, because of Sicular's behavior towards defendant Rodriguez on March 30, 2006, over one month prior to Sicular's protected activity, defendant Rodriguez requested that Sicular be terminated.  (See page 4 above.)

Additionally, Sicular failed to establish that defendant Ramos or defendant Rodriguez were aware of his filing.  In fact, defendant Rodriguez testified that she was unaware that Sicular had filed, and later withdrew, an internal complaint against her.  (See page 12 above.)

Moreover, as discussed above, defendants have offered legitimate non-retaliatory reasons for Sicular's termination and Sicular did not demonstrate pretext (indeed, he admitted to his lateness and to his inappropriate comments about foreigners and immigrants).  Based on the foregoing, Sicular cannot prove that the reasons proffered by defendants for their actions including his termination were merely pretextual and motivated by retaliation.  Defendants are entitled to summary  judgment on Sicular's retaliation claim.

**VII.   SICULAR'S CLAIMS UNDER THE NEW YORK STATE HUMAN RIGHTS LAW AND THE NEW YORK COUNTY HUMAN RIGHTS LAW ARE BARRED**

As noted above, with exceptions not relevant here (see page 32 n.17 above), claims brought pursuant to the NYSHRL and NYCHRL are analyzed under the same rubric as Title VII.  Therefore, for the reasons stated above, Sicular's NYSHRL and NYCHRL discrimination and retaliation claims fail for the same reasons as his Title VII and ADEA claims.

In addition, a plaintiff asserting claims under the NYSHRL and/or NYCHRL is required to proceed by either filing a complaint in an administrative forum or in a state court, but not both.  See N.Y. Exec. Law § 297 (9); N.Y.C. Admin. Code § 8-502(a); see also, e.g., Moodie v. Fed. Reserve Bank of N.Y., 58 F.3d 879, 882-83 (2d Cir. 1995); Marine Midland Bank v. N.Y.S. Div. of Human Rights, 75 N.Y.2d 240, 552 N.Y.S.2d 65 (4th Dep't 1989).  These judicial and administrative remedies are intended to be mutually exclusive.  Therefore, when the administrative forum makes a final determination and issues a "No Probable Cause" determination, plaintiff's NYSHRL and NYCHRL claims are barred from being relitigated in a subsequent civil action in federal court.  See, e.g., Lopes v. Caffe Central LLC, 06 Civ. 9927, 2009 WL 102212 at *1 (S.D.N.Y. Jan. 14, 2009); Illie-Stout v. Barrier Free Living, Inc., 08 Civ. 6388, 2009 WL 81151 at *1-2 (S.D.N.Y. Jan. 12, 2009) (Lynch, D.J.); Mendez v. City of N.Y. Human Res. Admin., 04 Civ. 0559, 2005 WL 2739276 at *2 (S.D.N.Y. Oct. 24, 2005); Thomas v. N.Y.C. Health & Hosps. Corp., 02 Civ. 5159, 2004 WL 1962074 at *1 n.1 (S.D.N.Y. Sept. 2, 2004).  Sicular admitted that his CCHR claims are identical to his claims in this case.  (See page 18 above.)  Therefore, Sicular's decision to file an administrative complaint with the CCHR constituted an irrevocable election of remedies requiring that the NYSHRL and NYCHRL claims asserted in this case be dismissed in their entirety.

Similarly, because Sicular's NYCHRL claims herein are identical to those asserted in his CCHR complaint, Sicular is precluded by the doctrines of res judicata and collateral estoppel from reasserting these claims.  See DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 117 (2d Cir.) (applying the doctrines of res judicata and collateral estoppel to quasi-judicial

determinations of the State Division of Human Rights), cert. denied, 484 U.S. 965, 108 S. Ct. 455 (1987); see also, e.g., McFarland v. NYS Div. of Human Rights, 241 A.D.2d 108, 112, 671 N.Y.S.2d 461, 464 (1st Dep't 1998) (SDHR does not issue a "No Probable Cause" determination until the plaintiff has had a "full and fair opportunity" to litigate her claims.).

## CONCLUSION

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 27) should be GRANTED as to all claims, i.e., both Sicular's federal claims under Title VII and the ADEA and his claims under the NYSHRL and NYCHRL. Sicular's motion to amend his complaint (Dkt. No. 34) to assert further damages should be denied as moot.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6.[37] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Alvin K. Hellerstein, 500 Pearl Street, Room 1050, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Hellerstein (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985);

---

[37] If the pro se plaintiff requires copies of any of the cases reported only in Westlaw, plaintiff should request copies from defense counsel. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.1(c)

IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S.

822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968

F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health

& Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d

Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72.


DATED:      New York, New York
            February 4, 2010

                                   Respectfully submitted,


                                   Andrew J. Peck
                                   United States Magistrate Judge

Copies mailed to:      Roy Sicular (Regular & Certified Mail)
                       Rebecca R. Hirschklau, Esq.
                       Judge Alvin K. Hellerstein


H:\OPIN\SICULAR